IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

BROOK PLAISANCE,
FREDRICK BASS,
AMANDA COLEMAN,
STEPHEN STRICK,
AND WILLIAM GRIESHABER,
 on behalf of themselves and all others
similarly situated,

                    PLAINTIFFS,

                                        CIVIL ACTION NO.

V.

                                        _____

STATE OF LOUISIANA;
LOUISIANA WORKFORCE COMMISSION;
AVA DEJOIE, in her official capacity as Secretary
of the Louisiana Workforce Commission; and
JOHN BEL EDWARDS, in his official capacity
as chief executive officer of the State of Louisiana,
                    DEFENDANTS.

COMPLAINT – CLASS ACTION

PLAINTIFFS, BROOKE PLAISANCE;
FREDRICK BASS; AMANDA COLEMAN;
STEPHEN STRICK; AND WILLIAM GRIESHABER'S,
ORIGINAL COMPLAINT, REQUEST FOR IMMEDIATE TEMPORARY
INJUNCTION WITHOUT HEARING, AND PRELIMINARY AND
PERMANENT INJUNCTION AFTER HEARING,
ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED

- 1 -

Plaintiffs, Brooke Plaisance; Fredrick Bass; Amanda Coleman; Stephen Strick; and William Grieshaber, who are bringing suit on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), bring this class action suit, request for temporary restraining order without hearing, and after hearing, preliminary and permanent injunction, for violations of Plaintiffs' right to procedural due process.  Suit is brought against the State of Louisiana; the Louisiana Workforce Commission; Ava Dejoie, in her official capacity as Secretary of the Louisiana Workforce Commission; and John Bel Edwards, in his official capacity as chief executive officer of the State of Louisiana.  Plaintiffs would show unto the Court as follows.

### I.    – <u>JURISDICTION AND VENUE</u>

1.    Jurisdiction is invoked under 28 U.S.C. section 1331 (federal question).

2.    Jurisdiction is invoked under 42 U.S.C. section 1983; Plaintiffs assert the following:

   a. Defendants' violation of Section 303(a)(1) of the Social Security Act, and request injunctive relief against the Defendants;

   b. Plaintiffs assert Defendants' violation of the Takings Clause of the Fifth Amendment to the United States Constitution, and of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

3.    Plaintiffs seek certification of this suit as a class action, pursuant to Federal Rule of Civil Procedure 23, for the following reasons:

    a.  Thousands of individuals have been damaged by the Defendants' actions, as specifically complained of hereinbelow, and issues of material fact are common to the members of the class; accordingly, joinder of all members is impracticable;

    b.  The factual and legal bases upon which named Plaintiffs claim relief are typical of members of the class; and named Plaintiffs will fairly and adequately represent members of the class;

    c.  Prosecuting separate actions by Plaintiffs may result in varying outcomes, and may establish incompatible standards of conduct for the Defendants;

    d.  Adjudication of claims as to individual members of the class would be dispositive of claims of other individual members not a party to the suit; and

    e.  Questions of fact and law, which are common to all class members, predominate over any factual issues unique to any one class member, such that a class action is appropriate and preferable as a method of fairly and efficiently resolving the controversy.

## II.    – **PARTIES**

4.    Plaintiff Brooke Plaisance, at all times during the events giving rise to the instant suit, has been a resident of and domiciled in the State of Louisiana;

5.    Plaintiff Fredrick Bass, at all times during the events giving rise to the instant suit, has been a resident of and domiciled in the State of Louisiana;

6.    Plaintiff Amanda Coleman, at all times during the events giving rise to the instant suit, was a resident of the State of Louisiana;

7.    Plaintiff Stephen Strick, at all times during the events giving rise to this suit, has been a resident of and domiciled in the State of Louisiana;

8.    Plaintiff William Grieshaber, at all times during the events giving rise to this suit, has been a resident of and domiciled in the State of Louisiana;

9.    All Plaintiffs not named in this suit, but included in this class action, were residents of the State of Louisiana, or were domiciled in the State of Louisiana, at all times which are relevant to the events giving rise to this suit, or have been eligible to, and have, made application to the Louisiana Workforce Commission for Unemployment Compensation, at some time since March 13, 2020.

10.    Defendant John Bel Edwards is sued in his official capacity.  In that capacity, Defendant John Bel Edwards is the Chief Executive Officer for the State of Louisiana, and is responsible for ensuring that departments of the State of Louisiana comply with and implement the law; heads of departments are subject to

requirements to report to Defendant John Bel Edwards.  La. Const. Art. IV, Section Five.  At all times relevant to this suit, Defendant John Bel Edwards acted in his official capacity and under color of state law.

11.    Defendant Ava Dejoie is sued in her official capacity.  Defendant Ava Dejoie exercises authority to administer and enforce the laws and regulations applicable to the Louisiana Workforce Commission, including federal and state law and regulation pursuant to the CARES Act, and all supplements and additions thereto, including the Consolidated Appropriations Act, 2021.  At all times relevant to this suit, Defendant Ava Dejoie acted in her official capacity and under color of state law.

12.    Defendant Louisiana Workforce Commission is a department of the executive branch of the Louisiana State government, headquartered in Baton Rouge, Louisiana.

13.    Defendant State of Louisiana is sued as a proper Defendant in an action for damages pursuant to 42 United States Code Section 1983.

## III.    –<u>FACTS SUPPORTING CLAIMS</u>

14.    On December 31, 2019, the Wuhan Municipal Health Commission in China reported a cluster of viral pneumonia cases; on January 9, 2020, a novel coronavirus was identified as the cause of these cases.[1]

---

[1] https://www.who.int/news/item/29-06-2020-covidtimeline (last visited February 8, 2021).

15.    On January 10, 2020, the World Health Organization released information to its regional emergency directors regarding management of infection and prevention of viral spread, based on what was known of the virus at the time.  *Id.*

16.    On January 11, 2020, Chinese media reported the first coronavirus death; on January 12, 2020, China shared the genetic sequencing of COVID-19.  *Id.*

17.    COVID-19 cases in other countries began cropping up in late January 2020; on January 30, 2020, the World Health Organization declared a global health emergency; and during the month of February, 2020, various global health organizations began mobilizing to address the threat to the public health.  *Id.*

18.    On February 29, 2020, the first death from COVID-19 was reported in the United States; by March 26, 2020, the United States had the most confirmed cases of COVID-19 in the world.[2]

19.    Businesses across the country experienced sudden, unprecedented economic disruption as a result of COVID-19.[3]  Businesses across the country closed down due to COVID-19 mandates and restrictions, laying off or furloughing their workers.[4]

---

[2] https://www.nytimes.com/article/coronavirus-timeline.html (last visited February 8, 2021).

[3] https://www.sba.gov/funding-programs/loans/coronavirus-relief-options (last visited February 9, 2021).

[4] https://www.usatoday.com/story/money/2020/04/25/21-american-businesses-temporarily-laying-off-the-most-people/111592432/ (last visited February 9, 2021).

20.   In March 2020, the unemployment rate in the United States experienced its most drastic monthly rise since 1975; the number of unemployed workers rose to 7.1 million, up from 1.4 million the previous month.[5]

21.   In April 2020, the national rate of unemployment skyrocketed; it was the single largest monthly increase in unemployment since 1948, which was the year the U.S. Bureau of Labor Statistics began keeping records.[6]  By the end of the month of April, the number of unemployed workers in the United States had risen to 23.1 million.  *Id.*

22.   On March 13, 2020, the President declared a national emergency, due to public health crisis caused by COVID-19.[7]  One of the driving purposes of the declaration was to enable economic assistance under law, both to bolster the economy generally and to provide relief to individuals.  *Id.*

23.   The Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law on March 27, 2020.  It expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic,

---

[5] https://www.bls.gov/news.release/archives/empsit_04032020.htm (last visited February 9, 2021).

[6] https://www.bls.gov/news.release/archives/empsit_05082020.htm (last visited February 9, 2021).

[7] https://www.ncsl.org/ncsl-in-dc/publications-and-resources/president-trump-declares-state-of-emergency-for-covid-19.aspx (last visited February 8, 2021).

including for workers who are not ordinarily eligible for unemployment benefits; it provided states with emergency administrative grant funding for this purpose, for extended benefits paid through December 31, 2020, and it allowed payment of benefits, retroactively to March 13, 2020.[8]

24.   The CARES Act included the Relief for Workers Affected by Coronavirus Act, which was set out Title II, Subtitle A. Section 2102.  This section created a new temporary federal program called Pandemic Unemployment Assistance (PUA); in general, PUA provided up to 39 weeks of unemployment benefits, and also provided funding to states for the administration of the program.

25.   The PUA program provided benefits for self-employed individuals and individuals seeking part-time employment, and also included a catch-all provision for individuals who would otherwise be ineligible to receive unemployment benefits under state law.[9]

26.   In order to be eligible for PUA benefits, the program required that individuals demonstrate ability and availability to work, but that they were unemployed because of COVID-19.  *Id.*

---

[8] *See https://home.treasury.gov/policy-issues/cares* (last visited February 1, 2021).

[9] https://www.dol.gov/newsroom/releases/eta/eta20200402-0, April 2, 2020 (last visited February 25, 2021)

27.    The CARES Act further provided an additional temporary weekly benefit, for weeks of unemployment occurring on or before July 31, 2020.[10]  An individual receiving either Pandemic Unemployment Assistance or regular Unemployment Insurance compensation was eligible to receive the additional temporary benefit, in the amount of $600 weekly, under the Federal Pandemic Unemployment Compensation (FPUC) program, if he or she were eligible for compensation for the week claimed.[11]

28.    Additionally, the CARES Act created the Pandemic Emergency Unemployment Compensation (PEUC) program, which allowed individuals who had exhausted benefits, under either regular unemployment or other programs, to receive up to thirteen (13) weeks of additional benefits.  *Id.*

29.    States were required to be flexible in allocating eligibility designations, in the context of the requirement that individuals be "actively seeking" employment, where an applicant's ability to seek employment was impacted by COVID-19. *Id.*

30.    On May 13, 2020, the Department of Labor directed that the PEUC program

---

[10] https://www.dol.gov/newsroom/releases/eta/eta20200402-0, april 2, 2020 (last visited February 25, 2021)(also cited at Footnote 9, *supra.*).

[11] Department of Labor Unemployment Insurance Program Letter 16-20 Change 1, April 27, 2020 (https://wdr.doleta.gov/directives/attach/UIPL/UIPL_16-20_Change_1.pdf), last visited February 6, 2021.

would "operate in tandem with the fundamental eligibility requirements of the Federal-state UI program, which remain in place."[12]

31.   PEUC requirements included that an individual be entitled to benefits only if he or she was not responsible for his or her unemployment, and also was able and available to work; specific work search requirements were also included; and states were required to be flexible in cases where individuals were unable to search for work due to COVID-19, "including because of illness, quarantine, or movement restriction." *Id.*

32.   On December 27, 2020, the President signed into law the Consolidated Appropriations Act, 2021, including Division N, Title II, Subtitle A (Continued Assistance Act or Act, Division N, Title II, Subtitle A).[13]  This Act amended certain provisions of the Emergency Unemployment Insurance Stabilization and Access Act (EUISAA), set out in Division D of the Families First Coronavirus Response Act (Pub. L. 116-127), the Coronavirus Aid, Relief, and Economic Security (CARES) Act (Pub. L. 116-136), and the Protecting Nonprofits from Catastrophic Cash Flow Strain Act of 2020 (Protecting Nonprofits Act) (Pub. L. 116-151), and created other new UI-related provisions (*id*).

---

[12] https://wdr.doleta.gov/directives/attach/UIPL/UIPL_17-20_Change-1.pdf, (May 13, 2020)(last visited February 25, 2021).

[13] *See* https://www.congress.gov/116/bills/hr133/BILLS-116hr133enr.pdf (last visited February 1, 2021).

33.    Pursuant to the Consolidated Appropriations Act, the UI-related provisions in EUISAA and the CARES Act are now extended beyond their original expiration date of December 31, 2020, and the Federal Pandemic Unemployment Compensation (FPUC) program, which provided a supplemental weekly benefit of $600 through July 31, 2020, was resumed for weeks of unemployment beginning after December 26, 2020, as a $300 supplement.[14]

34.    Section 242 of the Continued Assistance Act required that states implement procedures for timely payment by January 26, 2021.  *Id.*

35.    The Department of Labor's guidance to states, in the context of implementation of the December 27, 2020 Continued Assistance Act, included information regarding Department of Justice's investigation into fraudulent claims, per a report issued September 21, 2020.  *Id.*  Specifically, the Department of Labor's directive noted that states had been "experiencing a significant amount of imposter claims filed with stolen or false identities."  *Id.*

36.    The Department of Labor provided states with access, at no cost to states, to databases and technology designed to identify fraudulent claims; these included the Identity Data Hub, "which includes a variety of data sets to prevent and detect

---

[14] https://www.dol.gov/newsroom/releases/eta/eta20210105 (January 15, 2021)(last visited February 25, 2021.

fraud based on identity theft at the time of application, including an identity verification solution." *Id.*

37.    The importance of fraud detection, not least because states are required to have eligibility verification procedures in place to be qualified to receive federal funding, is not a new concern; that is, it was not a policy directive issued for the first time in the context of the December 27, 2020 Consolidated Appropriations Act.  The Department of Labor's guidance to states, issued on May 11, 2020, provides that in order to determine eligibility, states must require that claimants self-certify eligibility on a weekly basis; further, states must conduct a quarterly check to ensure that individuals were not eligible to receive regular unemployment benefits.[15]

38.    The Department of Labor provided funding to states to assist in fraud detection; as of January 15, 2021, Louisiana had been allocated $1,499,400.00 for implementation of procedures to verify identity and prevent fraud in Pandemic Unemployment Assistance claims; and $285,000.00 for identity verification and fraud prevention in Pandemic Emergency Unemployment Compensation claims. *Id.*

39.    Additionally, as of January 23, 2021, the State of Louisiana had received the

---

[15] https://wdr.doleta.gov/directives/attach/UIPL/UIPL_23-20.pdf (May 11, 2020)(last visited February 25, 2021).

following CARES Act Funding:

a.  $12,708,754 – Emergency Unemployment Insurance Stabilization and Access Act (EUISAA) of 2020;

b. $638,345,071 – Pandemic Unemployment Assistance (PUA);

c. $5,995,310 – Emergency Relief for governmental entities and non-profits;

d. $4,318,672,183 – Federal Pandemic Unemployment Compensation (FPUC);

e. $58,675,122 – Temporary Full funding of First Week of Regular Compensation;

f. $161,515,542 - Pandemic Emergency Unemployment Compensation (PEUC).[16]

40.    Accordingly, the total amount of federal funds received by the State of Louisiana pursuant to the CARES Act, as of January 23, 2021, is over five billion dollars ($5,195,871,982).  Of that amount, over four and a half billion dollars ($4,557,526,911) was specifically allotted for funding of unemployment benefits. *Id.*

41.    Immediately after passage of the CARES Act in March 2020, the Louisiana Workforce Commission began to receive an unprecedented influx in claims for unemployment benefits; new claims rose from an average of 1,500 per week to

---

[16] https://oui.doleta.gov/unemploy/docs/cares_act_funding_state.html (last visited January 26, 2021).

10,000 per week. As of March 31, 2020, the Commission stated that it was working to increase its capacity for claims processing.[17]

42. When a statute is facially unambiguous, agencies tasked with implementation of the law must strictly comply with the language enacted by the Congress. When an agency acts in an arbitrary and capricious manner by creating its own set of procedural regulations, and such action prevents thousands of people – who are struggling to survive in the midst of a global pandemic - from receiving badly-needed relief granted to them by Congress, the agency has caused great harm. Awaiting a final decision from the agency, in this case, would not provide an adequate remedy, and would create yet more irreparable harm.

43. The Commission has had ample opportunity to increase and train its staff; update its computer systems; and process claims; the Commission has received funds to alleviate the fiscal burden imposed by this necessity.[18]

44. As a condition of receiving federal emergency grant money, the State of

---

[17] 'No one was prepared for this': Crush of applicants delays Louisiana jobless claims amid coronavirus, Tyler Bridges, March 31, 2020, The New Orleans Advocate/Times-Picayune; https://www.nola.com/news/coronavirus/article_6d1f22ee-739e-11ea-97aa-3f8e46a96ef6.html (last visited January 26, 2021).

[18] Emergency grants for State administration were authorized in an amount of up to one billion dollars ($1,000,000,000) as of May 5, 2020 (Unemployment Insurance Program Letter 13-20, Change 1, May 5, 2020 (https://wdr.doleta.gov/directives/attach/UIPL/UIPL_13-20_Change_1.pdf) (last visited February 1, 2021)). In order to receive emergency grant funding, the State of Louisiana was required to take steps "to ease eligibility requirements and access to unemployment compensation for claimants" (*id.*).

Louisiana was instructed to process claims immediately. If a claimant was denied benefits, the State of Louisiana was obligated to "notify the applicant that the application for benefits has been received, identify the reason why the claim was not processed, and provide information about what steps the applicant can take to ensure the successful processing of the application."[19]

45. Despite the ten (10) months between onset of the pandemic and the time of filing of this Petition, the Commission continues to withhold benefits, failing or refusing to disburse funds to eligible claimants. The Commission's arbitrary and unlawful withholding of benefits has created financial uncertainty and distress for the very people whom the CARES Act was meant to assist.

46. The Commission has failed to provide any meaningful recourse for claimants, including failing to properly identify the reason why the claim was not processed, failing to provide information about what steps the applicant could take to ensure successful processing and making those processes practical (for example: advising claimants to call in to resolve issues with the Louisiana Workforce Commission when it is regularly impossible to get through to the call center to obtain meaningful assistance), failing to process claim applications timely, failing to correctly process claims (thereby causing further delays), failing to provide uniform information to all applicants regarding the same processing issues and/or

---

[19] *Id.*

failing to provide meaningful access to applicants seeking procedural correction and review, including a timely process to appeal and allow for timely review of incorrect determinations.

47.   The Commission has withheld benefits from Plaintiffs in multiple contexts. When some Plaintiffs' claims for benefits had been processed in 2020, Plaintiffs were entitled to payment of "back pay," in the form of benefits which had accrued but not yet been disbursed.  The CARES Act had retroactivity built in; the Act was signed into law on March 27, 2020, but the effective date for eligibility for unemployment, under the Act, was March 13, 2020.  The Department of Labor's April 27, 2020 letter to state workforce agencies provided the following guidance:

> An individual does not need to demonstrate good cause to backdate a PUA claim. Rather, the claim **must** be backdated to the first week during the Pandemic Assistance Period that the individual was unemployed, partially unemployed, or unable or unavailable to work because of a COVID-19 related reason listed in section 2102(a)(3)(A)(ii)(I) of the CARES Act.[20]

48.   With respect to the CARES Act's provision for the $600 additional Weekly Benefit Amount, the Department of Labor allowed for retroactivity of benefits payments as well, explaining as follows:

> FPUC is payable to individuals who are otherwise entitled under state or federal law to receive regular UC for weeks of unemployment (including Unemployment Compensation for Federal Employees

---

[20] Department of Labor Unemployment Insurance Program Letter 16-20 Change 1, April 27, 2020 (https://wdr.doleta.gov/directives/attach/UIPL/UIPL_16-20_Change_1.pdf), last visited February 6, 2021.

(UCFE) and Unemployment Compensation for Ex-Servicemembers
(UCX)). FPUC is also payable to individuals receiving the following
unemployment compensation programs: PEUC, PUA, EB, Short-
Time Compensation (STC), Trade Readjustment Allowances (TRA),
Disaster Unemployment Assistance (DUA), and payments under the
Self-Employment Assistance (SEA) program.
[….]
States that are unable to immediately pay benefits the week following
the execution of the agreement with the Department to operate the
program must provide retroactive payments to individuals eligible for
FPUC for the weeks they would have been entitled.[21]

49.    Some class members entitled to back pay have yet to receive full back

payment; some Plaintiffs have not received payment at all.  The Commission has

been inconsistent in their awarding of back pay to the same group of similarly

situation claimants.

50.    The Commission's failure to pay back pay to eligible claimants has caused

the most damage to individuals entitled to receive compensation under the PUA

program.

51.    Some Plaintiffs have made legitimate claims for benefits, and initially

received benefits payments.  Subsequently, some of these Plaintiffs have been able

to resume employment, albeit on a limited and part-time basis, due to COVID-19.

These Plaintiffs remain eligible for benefits, in an amount adjusted for their partial

---

[21] https://wdr.doleta.gov/directives/attach/UIPL/UIPL_15-20.pdf (last visited February 6, 2021).

income.[22]  However, Plaintiffs have been disqualified or have not received

payment, due to the Commission's error.

52.   Some Plaintiffs have made legitimate claims for benefits, and also initially

received payments.  Once their initial claims had been exhausted, these Plaintiffs

remained eligible for extensions of benefits payments, and applied and were

approved for Extended Benefits.  However, these Plaintiffs have yet to receive

payment for their Extended Benefits claims.

53.   Some Plaintiffs have made legitimate claims for benefits, but have been

inappropriately categorized as having received "overpayment of benefits" due to

the Commission's error.  Claimants have been notified of "overpayment" by

letters, which included statements that claimants could appeal the Commission's

overpayment determination within fifteen (15) days.

54.   However, when claimants have contacted the Commission after receiving

the letter, the Commission has informed that it will not even consider Plaintiffs'

appeals for at least four months.  Some claimants have not been able to get through

to the Commission by phone, and are unable to submit appeals online, due to the

---

[22] "The Department [of Labor] first defined "unemployment" in 1950 in its model for state legislation to meet the requirements of federal UC law.  The model defined "week of unemployment" as "any week during which [an individual] performs less than full-time work for any employing unit if the wages payable to [the individual] are less than the weekly benefit amount. (Manual of State Employment Security Legislation 1950)" (Unemployment Insurance Program Letter No. 10-20, March 20, 2020 https://wdr.doleta.gov/directives/attach/UIPL/UIPL_10-20.pdf (last visited February 1, 2021)).

Commission's failure to update and maintain its computer systems.  Some

claimants have also received additional letters, informing them that their tax

refunds will be seized and credited to the alleged overpayment.

55.   Insofar as the Commission has been investigating possible fraudulent claims,

the federal government has provided funding since at least May 11, 2020 to states

to assist with detection and prevention of fraud, and has also provided states with

access to technological tools and resources, in order to ensure efficient

administration of claims.[23]

56.   Finally, since passage of the Continued Assistance Act on December 27,

2020, some Plaintiffs have submitted legitimate applications for benefits, but

_____

[23] The Department of Labor's UIPL No. 9-21, dated December 30, 2020
(https://wdr.doleta.gov/directives/attach/UIPL/UIPL_9-21.pdf)(last visited February 11, 2021,
provides (in part) as follows:
UIPL No. 23-20, published on May 11, 2020, discusses program integrity for the UI system.
UIPL No. 28-20, published on August 31, 2020, provides states with funding to assist with
efforts to prevent and detect fraud and identity theft and recover fraud overpayments in the PUA
and PEUC programs.
[….]
ETA strongly encourages states to utilize the tools, resources, and services of the UI Integrity
Center, funded by the Department and operated in partnership with the National Association of
State Workforce Agencies. One of the key assets to support addressing fraud is the Integrity Data
Hub (IDH), which includes a variety of data sets to prevent and detect fraud based on identity
theft at the time of application, including an identity verification solution. ETA also encourages
states to consult with the UI Integrity Center on data analytics and to prioritize IDH hits, as well
as on other tools and solutions available through the private sector that complement the IDH. In
UIPL No. 28-20, the Department explained its expectation that states connect to the IDH no later
than March 31, 2021 and encouraged states to use their share of the funding provided through
that UIPL to support IDH connection as soon as possible. There is also a range of other tools on
the market that states should consider when combating fraud and ensuring program integrity.

have yet to receive payment of benefits due and owing to them.[24]  The delay in

implementing benefits payments under the new law is inexcusable, given the time

and resources afforded to the Commission since onset of the COVID-19 pandemic.

57.   Unemployed claimants, desperately in need of assistance, have experienced

issues in processing across the board.  Their claims have been processed

incorrectly; online portals reflect incorrect information; the Commission's website

is inaccessible, or the server crashes; claimants wait on hold for hours, only to be

disconnected by the Commission's telephone system, without ever having been

able to speak to a representative; and they are provided with non-uniform

information, depending on what Commission representative they speak with, and

are often told they cannot be helped.

58.   The United States Department of the Treasury describes the purpose of the

CARES Act and the 2021 supplemental legislation as follows: "[t]he Coronavirus

Aid, Relief, and Economic Security (CARES) Act and the Coronavirus Response

and Relief Supplemental Appropriations Act of 2021 provide ***fast and direct***

***economic assistance for American workers***" and families.[25]  The Commission

---

[24] The State of Louisiana received money from the federal government to pay Extended Benefits under the CARES Act (*id.*).

[25] https://home.treasury.gov/policy-issues/cares (last accessed February 8, 2021) [emphasis added].

has thwarted this objective, depriving thousands of individuals across the State of Louisiana of necessary economic assistance.

59.    Brooke Plaisance, class representative and Plaintiff herein, was employed with a commercial equipment repair company in March 2020.  Her employer, like many thousands of businesses across the country, was forced to furlough employees, due to the unprecedented interruption in revenue created by the COVID-19 global pandemic.  Ms. Plaisance was unfortunately one of these employees, and was furloughed on the last day of March, 2020.

60.    Ms. Plaisance submitted her application for unemployment benefits to the Louisiana Workforce Commission on the day that she was furloughed.  The Commission subsequently requested that Ms. Plaisance provide wage information, which she promptly uploaded through her online portal, per the Commission's requirements.  Otherwise, Ms. Plaisance has received no communication from the Commission regarding any information necessary to process her claim.

61.    The Commission failed to pay any benefits to Ms. Plaisance.  Ms. Plaisance subsequently contacted the Commission several times by telephone to ask about the status of her claim; she was instructed to file new claims.  Ms. Plaisance subsequently filed two new claims for unemployment benefits.

62.    Almost a year later, Ms. Plaisance has yet to receive a single benefit

payment on claims made pursuant to her April 1, 2020 furlough.  Ms. Plaisance's

online account provides for some benefit weeks that her claim is "processing."  For

other benefit weeks, Ms. Plaisance's benefit status provides "disqualified."

63.  Ms. Plaisance has received no communication from the Commission stating

why she was disqualified for certain weeks of benefits; she has received no

communication stating why certain benefits are still reflecting that they are

"processing."

64.  Ms. Plaisance is unable to administratively appeal the Commission's failure

to pay weekly benefits where the status for those weekly claims reflects that they

are processing, because the appeals process is only available for final

determinations.  Additionally, because Ms. Plaisance has not been provided any

notice of reasons for disqualification for some weekly claims, she is effectively

unable to appeal those determinations.

65.  Ms. Plaisance has also sent written communication to the Commission, by

email, requesting resolution of her claim.  Ms. Plaisance has never received any

response to this request.

66.  Ms. Plaisance has suffered economic distress and related injuries, and has

incurred other damages, including emotional distress.

67.  Ms. Plaisance has not been provided any meaningful opportunity to be

heard; has no recourse with the Commission, and is subject to ongoing harm as a result of the Commission's failure to pay benefits, which have now been due and owing for the better part of a year.

68.   Fredrick Bass, class representative and Plaintiff herein, was separated from his job as a plant worker, as a direct result of COVID-19, in April 2020.

69.   Mr. Bass initially received benefits.

70.   In August 2020, Mr. Bass began having issues with his claim when his online account denied him access to the weekly claim certification process.

71.   Mr. Bass called the Commission and spoke with a representative on the telephone; the representative informed him that he needed to file a new claim, or he would be permanently ineligible for benefits moving forward.

72.   As instructed by the Commission, Mr. Bass subsequently filed a new claim for unemployment compensation.

73.   When Mr. Bass' new claim was processed, the Commission classified his claim as a regular unemployment claim; the Commission had apparently previously characterized his claim as either PUA or PEUC.

74.   Mr. Bass neither was or is responsible for interpreting the provisions of the CARES Act, its attendant legislation, or policy directives issued by the Department of Labor; Mr. Bass was, and remains, eligible to receive benefits.

75.   However, after Mr. Bass followed instructions and filed his new claim, the Commission classified all benefits previously received by Mr. Bass as "overpayment."

76.   On January 7, 2021, Mr. Bass received notice that his claim had been re-classified; however, on January 8, 2021, the Commission regenerated the "overpayment" status and related issues.

77.   The deadline for appealing the January 8, 2021 redetermination of overpayment was January 21, 2021; however, the option for appealing online was not available to Mr. Bass through his online account.

78.   Mr. Bass attempted to resolve the issue with the Commission, by calling to speak to a representative.  On one occasion, Mr. Bass was on hold for seven (7) hours; on another occasion, he was on hold for four (4) hours; his calls were then abruptly disconnected.

79.   Mr. Bass has not received payments of any of the unemployment compensation due him, for over twenty-three (23) weeks, as of the time of filing this petition.

80.   Mr. Bass has also been assessed with a debt of thousands of dollars by the Commission.

81.   Mr. Bass' damages were extensive; he was unable to pay for basic living

expenses; was homeless for a time; and has incurred other damages, including emotional distress.

82.  Mr. Bass is unable to appeal the denial of benefits; has not been provided a meaningful opportunity to be heard; and has no recourse with the Commission at this time.

83.  Amanda Coleman, class representative and Plaintiff herein, was employed as a healthcare provider, but was laid off in March 2020 due to COVID-19.

84.  Ms. Coleman was unaware that she was eligible for benefits for a period of time after separation from employment, but was prompted by her former employer to submit her claim.

85.  Ms. Coleman submitted her claim for unemployment benefits to the Commission in or around May 2020, and qualified for and received benefits.

86.  Ms. Coleman never received the backpay due her, from the time of separation from employment through the date of submission of her claim.

87.  Ms. Coleman continued to submit her weekly certifications and received weekly benefits until late December, 2020.

88.  Ms. Coleman received an (erroneous) overpayment determination notice from the Commission in the first week of January 2021.

89.  On January 9, 2021, Ms. Coleman submitted an appeal of the overpayment determination.

90.   A month later, on February 10, 2021, the Commission sent a letter to Ms. Coleman, acknowledging receipt of her appeal, and informing her that "an appeal hearing will be scheduled within the near future."

91.   As of the date of filing of the instant petition, no appeal hearing has been set in Ms. Coleman's case.

92.   Ms. Coleman has continued to submit her weekly claim certifications.

93.   Ms. Coleman's online account with the Commission notes that she is "disqualified" from benefits payments.

94.   Ms. Coleman has not received any of the unemployment benefits due her in approximately two months, as of the date of filing the instant petition.

95.   Ms. Coleman has suffered economic distress and related injuries, and has incurred other damages, including emotional distress.

96.   Ms. Coleman has not been provided a meaningful opportunity to be heard; has no recourse with the Commission at this time; and continues to suffer harm as a result of the Commission's withholding of benefits due her.

97.   Stephen Strick, class representative and Plaintiff herein, was self-employed in the construction business, working primarily on home remodeling.  After onset of the COVID-19 pandemic, he found himself unable to work, due to the resulting restrictions and complications.

98.   Mr. Strick received PUA benefits in 2020, although he has never

received the back pay owed him.

99.  Mr. Strick received an overpayment determination from the Commission for PUA benefits received in 2020, based on the Commission's finding that he had not been eligible to receive the PUA benefits paid to him.

100. Because the Commission's overpayment determination was incorrect, Mr. Strick submitted an appeal.

101. Mr. Strick subsequently received additional incorrect overpayment determination notices for PUA benefits received in 2020.

102. Mr. Strick did not submit additional appeals; additional appeals would have been duplicative.

103. The Commission disqualified Mr. Strick from eligibility for payment of benefits, providing that, because Mr. Strick had not submitted appeals in response to the subsequent, duplicative, incorrect notices of overpayment, Mr. Strick's overpayment determination had become final.

104. Mr. Strick communicated with the Commission on the issue, promptly providing the information necessary to prove that he had been eligible to receive PUA benefits in 2020, and therefore that the overpayment determination had been made in error; a Commission representative informed Mr. Strick that all issues with his claim had been resolved, and he was eligible for payment of benefits.

105. Now months later, Mr. Strick has yet to receive any payment of benefits,

despite his continued eligibility and weekly certification of his claim.

106. Mr. Strick has suffered economic distress and related injuries, and has incurred other damages, including emotional distress.

107. Mr. Strick is unable to appeal the denial of benefits; has not been provided a meaningful opportunity to be heard; and has no recourse with the Commission at this time.

108. William Grieshaber, class representative and Plaintiff herein, was laid off from his long-time job as assistant manager of a restaurant in Walker, Louisiana, just after the onset of the pandemic, due to COVID-19. Mr. Grieshaber subsequently filed a claim for unemployment and received compensation.

109. In January 2021, Mr. Grieshaber received a series of five (5) letters from the Commission, stating that he had been overpaid, and assessing him with a debt to the Commission, in the approximate amount of $18,000.00 (eighteen thousand dollars), comprising the full amount of all payments made to Mr. Grieshaber over an eight-month period of time.

110. The Commission stated that Mr. Grieshaber had been ineligible to receive unemployment benefits because he had left his previous employment to take another job.

111. Mr. Grieshaber, who had worked in the food service industry, as an assistant

manager, in the same position for over seven (7) years prior to the onset of the pandemic, was laid off due to his employer's closing, and has been unemployed since.

112. The Commission failed to notify Mr. Grieshaber of its (incorrect) eligibility assessment for eight months, paying Mr. Grieshaber's benefits on a weekly basis, and then suddenly terminating benefits and stating that Mr. Grieshaber is bound to pay them all back.

113. Commission representatives have suggested to Mr. Grieshaber that he should request a waiver, which essentially requires that an individual claimant provide evidence of finances and other information, and verify that he would not have accepted funds had he known he was ineligible to receive them.  The waiver request therefore requires that an individual admit that he does owe the incorrectly assessed overpayment.[26]

114. If Mr. Grieshaber submits an administrative appeal, according to multiple Commission representatives, the appeal process will take over four months.

115. Meanwhile, collections attempts will presumably continue; if Mr.

---

[26] Section 262 of the Continued Assistance Act provides that states may waive overpayments under the Lost Wages Assistance (LWA) program when the individual is not at fault for the payment and repayment would be contrary to equity and good conscience. UIPL 9-21, December 30, 2020 (https://wdr.doleta.gov/directives/attach/UIPL/UIPL_9-21.pdf)(last visited February 11, 2021).

Grieshaber files his tax returns, any refund he is due may be seized to satisfy the amount he has allegedly overpaid.

116. In the interim, Mr. Grieshaber will not be receiving the compensation he is entitled to, and which is owed to him, due to the Commission's erroneous disqualification of his claim.

117. Mr. Grieshaber has been placed in an untenable situation, in which he is essentially being forced to admit that he owes the Commission eighteen thousand dollars, by signing off on a waiver request.  If he does not do so, he will face collections, at a time when he is in a vulnerable financial position.

118. Mr. Grieshaber has suffered economic distress and related injuries, and has incurred other damages, including emotional distress.

119. Mr. Grieshaber's right to appeal the Commission's decision is meaningless, due to the time that processing the appeal will take.  Mr. Grieshaber has no recourse with the Commission at this time.

## IV.   PLAINTIFFS' PROCEDURAL DUE PROCESS CLAIMS, PURSUANT TO THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

120. "The Fourteenth Amendment to the Constitution of the United States prevents States from depriving "any person of life, liberty, or property without due process of law."  "The fundamental requirement of due process is the opportunity

to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

121. Specifically, consideration must be given to the following three factors: the property interest affected by the official action; the risk of erroneous deprivation of said property interest through the procedures used, and the value of additional or substituted safeguards to procedure; and the governmental interest, including the function which the governmental entity is performing, taken together with the burden, both monetary and administrative, which would be imposed by any additional procedural requirements. *Id.* at 335.

122. The United States Supreme Court has held that the right to procedural due process is "absolute." *Carey v Piphus*, 435 US 247, 266, 267-268; 98 S Ct 1042; 55 L Ed 2d 252 (1978). The Court reasoned that procedural due process is so fundamentally important to an organized society, that denial thereof is actionable in and of itself.

123. Defendant Ava Dejoie ("Secretary Dejoie"), in her official capacity, has acted unreasonably and arbitrarily; as a result of her actions and/or inactions, Plaintiffs have suffered great harm.

124. Secretary Dejoie has failed to ensure the Commission's implementation of

methods of administration of benefits which are reasonably calculated to insure

full payment of unemployment compensation when due.  Specific due process

violations include, but are not necessarily limited to, the following:

a    Failure to obtain and/or maintain an appropriate level of staffing;

b.    Failure to train its staff properly;

c.    Failure to update/service/maintain its server/computer systems to a

necessary and appropriate level of functionality;

d.    Failure to communicate appropriately with claimants regarding claims

processing;

e.    Inappropriately and improperly denying benefits to claimants,

including designating eligible claimants as ineligible;

f.    Failing to rectify its erroneous ineligibility determinations;

g.    Failing to pay benefits when due;

h.    Failing to provide an adequate and reasonable process by which

claimants may address the Commission's ineligibility determinations;

i.    Failing to provide an adequate and reasonable process by which

claimants may address the Commission's failure to pay benefits;

j.    Continuing to withhold benefits due to claimants, effectively taking

and/or denying relief to which claimants are entitled.

125. Defendant John Bel Edwards ("Governor Edwards"), in his official capacity,

has failed to ensure the Commission's timely processing and payment of claims.

126. Governor Edwards has recently represented that the Commission is doing everything within its power to process claims.[27]

127. Governor Edwards has, therefore, admitted his knowledge of the problem, and of the deficiencies within the Workforce Commission's claims processing system.  If the Commission is actually working around the clock, as Governor Edwards stated, and yet the compensation due and owing to Plaintiffs has not been paid, there is clearly a violation of the CARES Act.  Plaintiffs should not and cannot lawfully be made to suffer for the deficiencies of the Louisiana Workforce Commission.

128. Despite his capacity, as Chief Executive Officer, to direct and ensure compliance with the law, Governor Edwards has failed to do so, to the severe detriment of the Plaintiffs.

129. Plaintiffs have suffered actual injury.  Defendants' failure to provide procedural due process with respect to payment of benefits has resulted in Plaintiffs' inability to pay for necessary expenses, such as rent; mortgages; basic utilities; and food.  Plaintiffs have been forced to move out of their homes, as a result of being unable to pay rent, or facing foreclosure actions; Plaintiffs have

---

[27] https://www.wdsu.com/article/governor-edwards-says-officials-are-working-around-the-clock-to-fix-unemployment-issues-around-the-state/35295791# (last visited February 1, 2021).

suffered termination of utilities and telephone services; have lost vehicles to repossession; have incurred late fees; and have lost necessary insurance coverage. Many Plaintiffs no longer have a good credit rating, which compounds their financial hardship.  Plaintiffs have incurred other damages, including, but not necessarily limited to, emotional distress.

## V.     PLAINTIFFS' UNLAWFUL TAKINGS CLAIMS, PURSUANT TO THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES

130. The Fifth Amendment to the United States Constitution prohibits the taking of private property for public use, without just compensation (the "takings clause").  The Fifth Amendment's takings clause also binds the States, through the Fourteenth amendment.

131. Restriction of property rights, even without outright appropriation, may be classified as an unlawful regulatory taking.  *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922).  When a property owner is deprived of property by a regulatory taking, and the property is later returned to her, the owner is entitled to compensation for the period during which the taking was effective.  *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California,* 482 U.S. 304, 107 S. Ct. 2378, 96 L. Ed. 250.

132. The Fifth Amendment's takings clause also protects against governmental

takings of personal property. *Horne v. Department of Agriculture*, 569 U.S. 513, 576 U.S. 350, 135 S.Ct. 2419 (2015).

133. In this case, the federal government set aside funds to be disbursed to claimants by the States. The State of Louisiana is responsible for payment of those monies to claimants. The State of Louisiana has also appropriated funds for payment to eligible claimants.

134. Plaintiffs have fulfilled all necessary prerequisites, as provided by state and federal law and regulation, for release of those funds. Accordingly, payments are due and owing the Plaintiffs. Nevertheless, Defendants have failed or refused to pay benefits to claimants when due.

135. Defendants' failure to release monies due and owing the Plaintiffs has resulted in damage to the Plaintiffs, which include Plaintiffs' having been forced to move, as a result of being unable to pay rent, or facing foreclosure action on homes which they own; termination of utilities and telephone services; loss of vehicles to foreclosure; incurring late fees; loss of necessary insurance coverages; loss of credit rating; and emotional distress.

136. The policies, practices, and/or procedures exercised by the Commission, as sanctioned, permitted, and/or implemented by Secretary Dejoie and/or Governor Edwards, were the moving force behind the violation of Plaintiffs' legal rights.

137. Defendants' unlawful actions, or failures to act, include, but are not necessarily limited to, the following:

   a. Failure to obtain and/or maintain an appropriate level of staffing;

   b. Failure to train its staff properly;

   c. Failure to update/service/maintain its server/computer systems to a necessary and appropriate level of functionality;

   d. Failure to communicate appropriately with claimants regarding claims processing;

   e. Inappropriately and improperly denying benefits to claimants, including designating eligible claimants as ineligible;

   f. Failing to rectify its erroneous ineligibility determinations;

   g. Failing to pay benefits when due;

   h. Failing to provide an adequate and reasonable process by which claimants may address the Commission's ineligibility determinations;

   i. Failing to provide an adequate and reasonable process by which claimants may address the Commission's failure to pay benefits;

   j. Continuing to withhold benefits due to claimants, effectively taking and/or denying relief to which claimants are entitled.

## VI.  PLAINTIFFS' CLAIMS FOR VIOLATION OF SECTION 303(a)(1) OF THE SOCIAL SECURITY ACT

138. Section 303(a)(1) of Title the Social Security Act (SSA) ("Grants to

States for Unemployment Compensation Administration Appropriation") requires that, as a condition of a state receiving administrative grants for its Unemployment Insurance program, state law must provide for "methods of administration as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due."  Since onset of the COVID-19 pandemic in March 2020; subsequent enactment of the CARES Act; and disbursement of emergency administrative grant funding, the Commission has had ample opportunity to increase and train its staff; update its computer systems; and process claims.

139. The Commission has failed to make full payment of unemployment compensation due to Plaintiffs; neither Governor Edwards nor Secretary Dejoie, in their respective official capacities, has taken the necessary action to rectify the severe deficiencies within the Commission.

140. For some Plaintiffs, unemployment compensation has been due for almost a year, as of the date of filing this complaint.  For other Plaintiffs, compensation has been due for months.

141. The United States Supreme Court has held that individuals have a right of action, under 42 U.S.C. Section 1983, against governmental entities for delays in payment of unemployment benefits, by way of Section 303(a)(1) of the Social Security Act.  *California Department of Human Resources Development v. Java,*

402 U.S. 121 (1971).  The Supreme Court found that suspension of unemployment benefits for an average of seven weeks was not "reasonably calculated to insure full payment of unemployment compensation when due."  *Id.* at 531.

142.  Title 20, Part 650 of the Social Security Act is titled "Standard for Appeals Promptness – Unemployment Compensation."  Section 650.1(a) provides:

> This standard is responsive to the overriding concern of the U.S. Supreme Court in California Department of Human Resources v. Java, 402 U.S. 121 (1971), and that of other courts with delay in payment of unemployment compensation to eligible individuals, including delays caused specifically by the adjudication process. The standard seeks to assure that all administrative appeals affecting benefit rights are heard and decided with the greatest promptness that is administratively feasible.

143. Sections 650.3 and 650.4, of the Social Security Act requires that states issue benefit determinations "with the greatest promptness that is administratively feasible" (650.3(a)(1)-(2); 650.4(a)).  Further, States are to process appeals within thirty (30) to forty-five (45) days of benefits determinations (650.4(b)).

144.  In the context of the emergency nature of the relief contemplated by the CARES Act; the generous funding provided to the State of Louisiana to assist with administration; and the intervening ten-month period of time, the State of Louisiana has failed to issue benefits determinations with "the greatest promptness that is administratively feasible;" has failed to process appeals timely; and has frustrated the spirit and purpose of both the CARES Act and the Social Security

Act's provisions; these provisions contemplate both timely and expedited release of desperately-needed benefits, which are due and owing to claimants, and expedited processing of benefits determinations and appeals.

## VII.   - CUSTOM, POLICY, PRACTICE

145. The customs, policies, practices, and/or procedures exercised by the Commission, as sanctioned, permitted, and/or implemented by Secretary Dejoie and/or Governor Edwards, were the moving force behind the violation of Plaintiffs' legal rights.

146. All Defendants are jointly and severally liable for violations of Plaintiffs' legal rights.

## VIII.  REQUEST FOR ENTRANCE OF A TEMPORARY INJUNCTION, ENJOINING DEFENDANTS FROM FURTHER DELAYS IN RELEASING COMPENSATION DUE, AND FROM FURTHER DELAYS IN PROCESSING CLAIMS AND APPEALS

147. Federal Rule of Civil Procedure 65(b) provides that the Court may issue a temporary restraining order, without notice to the adverse party or counsel, only if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."

148. Here, payments are now due to the Plaintiffs because Congress has enacted a

plan anticipated to provide relief during a time of national emergency. Given the Supreme Court's finding that a seven-week delay was not reasonable; the subsequent passage, by the Social Security Administration, of guidelines contemplating a maximum of forty-five (45) days for processing appeals of regular claims (i.e. claims not made during a national emergency/disaster); and the CARES Act's contemplation of expedited claims processing and payment of benefits, delays of weeks and months are definitely not reasonable.

149. Plaintiffs respectfully represent that there is no question that claims have been delayed and have not been timely processed; indeed, delay in payments has been publicly acknowledged by Governor Edwards (*see* footnote 9, *supra*).

150. Plaintiffs further represent that delay in payment of benefits represents an immediate and irreparable harm.

151. The Commission has also denied Plaintiffs procedural due process by its failure to process claims; failure to process appeals; failure to rectify errors; and failure to provide any recourse to Plaintiffs in these contexts. The Commission's denial of procedural due process has caused harm, and continues to cause harm, in and of itself, pursuant to *Carey v Piphus*, 435 US 247, 266, 267-268; 98 S Ct 1042; 55 L Ed 2d 252 (1978).

152. Generally speaking, withholding of funds, from a payee to whom they are

owed, will always result in some damage.  In this case, where the funds so clearly have been allotted to meet an emergent need, contemplating assistance with basic living expenses during a national emergency, the harm is self-evident.

153. Plaintiff Brooke Plaisance is owed compensation from April 2020 through July 2020.  The withholding of her benefits caused Ms. Plaisance to suffer financial hardship.  The Commission's continued withholding of benefits causes continuing harm to Ms. Plaisance; she incurred debts during this time period which she still owes, and continues to be unable to pay them.  Ms. Plaisance has no other remedy available to her.

154. Plaintiff Fredrick Bass continues to be eligible for benefits, and continues to comply with all requirements, including submitting his weekly claim certifications.  The Commission's failure to pay benefits to Mr. Bass is due to an error in classification of which the Commission is aware, and has failed or refused to rectify.  Mr. Bass has suffered harm, and continues to suffer harm as a result of the Commission's continued withholding of benefits owed to him.  Mr. Bass has no other remedy available to him.

155. Plaintiff Amanda Coleman has not received benefits owed her for approximately two months, despite her continued eligibility and compliance with all requirements, including submission of weekly claim certifications.  She is under severe financial strain.  She has suffered harm, and continues to suffer as a result of

the Commission's failure to pay compensation due her.  Ms. Coleman has no other

remedy available to her.

156. Plaintiff Steven Strick has not received benefits due him for months, despite

his continued eligibility and compliance with all requirements.  He has suffered

harm, and continued to suffer as a result of the Commission's failure to pay

benefits due him.  Mr. Strick has no other remedy available to him.

157. Plaintiff William Grieshaber continues to be eligible for benefits, and

continues to comply with all requirements, including submitting his weekly claim

certifications.  The Commission's failure to pay benefits to Mr. Grieshaber is due

to an error in classification; however, the Commission has failed or refused to

rectify the error, or even to allow Mr. Grieshaber to address the issue.  Mr.

Grieshaber has suffered harm, and continues to suffer harm, as a result of

continued withholding of compensation due him.  Mr. Grieshaber has no other

remedy available to him.

158. Accordingly, Plaintiffs are likely to succeed on their claims as to

withholding of benefits due, and also on their claims of denial of due process

(expedited claims determinations and processing of appeals).

159. Plaintiffs further represent that they continue to experience irreparable harm,

as a result of Defendants' failure to provide due process to the Plaintiffs, and

specifically as a result of Defendants' failure to pay compensation due to Plaintiffs.

160. Plaintiffs do not have an adequate remedy through the administrative process for resolution of their claims, as set forth hereinabove.

161. All named Plaintiffs have executed unsworn declarations, under penalty of perjury, pursuant to 28 United States Code Section 1746, verifying that all facts set forth herein, pertaining to each Plaintiff, respectively, are true and correct.

162. Accordingly, Plaintiffs request that a temporary restraining order issue, without notice, prohibiting Defendants from: (1) any further delays in processing benefits determinations as to claims pending for more than thirty (30) days prior to entrance of said temporary restraining order; (2) any further delays in processing appeals pending for more than thirty (30) days prior to entrance of the temporary injunction; (3) any further delays in rectifying incorrect classification(s) of claims, including incorrect overpayment designations; (4) any further delays in payment of compensation due to a claimant as of any date more than thirty (30) days prior to entrance of the temporary injunction; and (5) in order to identify the members of the class, that in conjunction therewith, Defendants provide to this Court, within ten (10) days of entrance of said injunction, the information necessary to identify the members of the class, including (1) those claimants to whom compensation is due, but has not been timely paid; (2) those claimants as to whom a determination of benefits has not been timely made; those claimants whose appeals have not been timely processed; (3) those claimants who have been prevented from timely

submission of appeals due to errors in the Commission's system of administration; and (4) those claimants whose been erroneously assessed with overpayment of benefits.

### IX.   – CLAIMS FOR DAMAGES

163.   Plaintiffs hereby incorporate each preceding paragraph as though fully set forth herein.

164.   Plaintiffs sue for:

    a.      Immediate payment of unemployment compensation due and owing;

    b.      Injunctive Relief with regard to Defendants' violation of Section 303(a)(1) of the Social Security Act;

    c.      Compensatory damages;

    d.      Reasonable and necessary attorneys' fees;

    e.      Pre-judgment and post-judgment interest;

    f.      Costs of court.

### X.    – PRAYER AND CONCLUSION; REQUEST FOR IMMEDIATE TEMPORARY INJUNCTION, WITHOUT HEARING; CERTIFICATION OF CLASS ACTION; FURTHER INJUNCTIVE RELIEF AFTER HEARING; JURY TRIAL; AND DAMAGES

165.   Plaintiffs, on behalf of themselves and all others similarly situated, request as follows:

    a.      That an immediate injunction issue, ordering Defendants to refrain from any further delays in processing benefits determinations as to claims pending

for more than thirty (30) days prior to entrance of injunction; any further delays in processing appeals pending for more than thirty (30) days prior to entrance of the temporary injunction; any further delays in rectifying incorrect classification(s) of claims, including incorrect overpayment designations; any further delays in payment of compensation due to a claimant as of any date more than thirty (30) days prior to entrance of the temporary injunction; and further, that in conjunction therewith, Defendants provide to this Court, within ten (10) days of entrance of said injunction, the following information:

b.     Identification of all claims on file with the Louisiana Workforce Commission, as to which benefits are due as of any date thirty (30) days or more prior to the date of entrance of a temporary injunction, for which funds have not yet been released;

c.     Identification of all claims on file with the Louisiana Workforce Commission, for which a final benefits determination has not been made, as to any claim(s) submitted more than thirty (30) days prior to the date of issuance of the temporary injunction;

d.     Identification of all claims on file with the Louisiana Workforce Commission, for which a claimant has received an adverse determination, but has been prevented from appealing due to any error in the Commission's system of administration, as to any claim(s) submitted since March 13, 2020;

e.      Identification of all claims on file with the Louisiana Workforce Commission, as to which an overpayment determination has been made by the Commission, at any time since November 1, 2020, on the basis of a claimant's ineligibility for PUA benefits;

f.      Identification of all claims on file with the Louisiana Workforce Commission, as to which an overpayment determination has been made since November 1, 2020, on the basis of a claimant's ineligibility for regular unemployment benefits.

g.      That Defendants be served with citation and notice of said temporary injunction, and that, after hearing, Plaintiffs' request for injunctive relief be granted, and an injunction issue, and Defendants be enjoined from any further delays in in processing claims and appeals;

h.      That Defendants be cited to appear and answer in this case, and that, after due proceedings be had, Plaintiffs be afforded a trial by jury;

i.      That Plaintiffs be awarded any and all relief to which they may be entitled, under law or in equity.

Respectfully submitted,

/s/ Wendy Manard
Wendy Manard (Bar Roll No. 29622)
Manard Law
1100 Poydras Street
Suite 2610
New Orleans, Louisiana 70163
Telephone: (504) 585-7777
Facsimile: (504) 556-2977
wendy@wmanard.com


/s/ Ellyn Clevenger
Ellyn J. Clevenger (Bar Roll No. 32395)
Manard Law
1100 Poydras Street
Suite 2610
New Orleans, Louisiana 70163
Telephone: (504) 585-7777
Facsimile: (504) 556-2977
ellyn@wmanard.com


ATTORNEYS FOR PLAINTIFFS


**A JURY TRIAL IS DEMANDED**