IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF LOUISIANA

BROOK PLAISANCE,
FREDRICK BASS,
AMANDA COLEMAN,
STEPHEN STRICK,
AND WILLIAM GRIESHABER,
 on behalf of themselves and all others
similarly situated,

PLAINTIFFS,

V.                                                    CIVIL ACTION NO. 21-121-BAJ-EWD

STATE OF LOUISIANA;
LOUISIANA WORKFORCE COMMISSION;
AVA DEJOIE, in her official capacity as Secretary
of the Louisiana Workforce Commission; and
JOHN BEL EDWARDS, in his official capacity
as chief executive officer of the State of Louisiana,
                    DEFENDANTS.

PLAINTIFFS, BROOKE PLAISANCE;
FREDRICK BASS; AMANDA COLEMAN;
STEPHEN STRICK; AND WILLIAM GRIESHABER'S,
MEMORANDUM IN SUPPORT OF MOTION FOR IMMEDIATE
TEMPORARY INJUNCTION WITHOUT HEARING,
AND INJUNCTION AFTER HEARING, ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED

Plaintiffs, Brooke Plaisance; Fredrick Bass; Amanda Coleman; Stephen

Strick; and William Grieshaber, respectfully request, on behalf of themselves and

all others similarly situated (collectively "Plaintiffs"), that this Court enter an

immediate temporary restraining order, without hearing, and after hearing and in due course, a preliminary and permanent injunction.  Plaintiffs would show unto the Court as follows.

## I.    –FACTS SUPPORTING REQUEST FOR INJUNCTIVE RELIEF

### A. Onset of COVID-19 Crisis

1.    On December 31, 2019, the Wuhan Municipal Health Commission in China reported a cluster of viral pneumonia cases; on January 9, 2020, a novel coronavirus was identified as the cause of these cases.[1]

2.    On January 10, 2020, the World Health Organization released information to its regional emergency directors regarding management of infection and prevention of viral spread, based on what was known of the virus at the time.  *Id.*

3.    On January 11, 2020, Chinese media reported the first coronavirus death; on January 12, 2020, China shared the genetic sequencing of COVID-19.  *Id.*

4.    COVID-19 cases in other countries began cropping up in late January 2020; on January 30, 2020, the World Health Organization declared a global health emergency; and during the month of February, 2020, various global health organizations began mobilizing to address the threat to the public health.  *Id.*

5.    On February 29, 2020, the first death from COVID-19 was reported in the

---

[1] https://www.who.int/news/item/29-06-2020-covidtimeline (last visited February 8, 2021).

United States; by March 26, 2020, the United States had the most confirmed cases of COVID-19 in the world.[2]

### B. Economic Impact

6.    Businesses across the country experienced sudden, unprecedented economic disruption as a result of COVID-19.[3]  Businesses across the country closed down due to COVID-19 mandates and restrictions, laying off or furloughing their workers.[4]

7.    In March 2020, the unemployment rate in the United States experienced its most drastic monthly rise since 1975; the number of unemployed workers rose to 7.1 million, up from 1.4 million the previous month.[5]

8.    In April 2020, the national rate of unemployment skyrocketed; it was the single largest monthly increase in unemployment since 1948, which was the year the U.S. Bureau of Labor Statistics began keeping records.[6]  By the end of the

---

[2] https://www.nytimes.com/article/coronavirus-timeline.html (last visited February 8, 2021).

[3] https://www.sba.gov/funding-programs/loans/coronavirus-relief-options (last visited February 9, 2021).

[4] https://www.usatoday.com/story/money/2020/04/25/21-american-businesses-temporarily-laying-off-the-most-people/111592432/ (last visited February 9, 2021).

[5] https://www.bls.gov/news.release/archives/empsit_04032020.htm (last visited February 9, 2021).

[6] https://www.bls.gov/news.release/archives/empsit_05082020.htm (last visited February 9, 2021).

month of April, the number of unemployed workers in the United States had risen

to 23.1 million.  *Id.*

### C. National Emergency: CARES Act Legislation

9.    On March 13, 2020, the President declared a national emergency, due to

public health crisis caused by COVID-19.[7]  One of the driving purposes of the

declaration was to enable economic assistance under law, both to bolster the

economy generally and to provide relief to individuals.  *Id.*

10.    The Coronavirus Aid, Relief, and Economic Security (CARES) Act was

signed into law on March 27, 2020.  It expanded states' ability to provide

unemployment insurance for many workers impacted by the COVID-19 pandemic,

including for workers who are not ordinarily eligible for unemployment benefits; it

provided states with emergency administrative grant funding for this purpose, for

extended benefits paid through December 31, 2020, and it allowed payment of

benefits, retroactively to March 13, 2020.[8]

11.    The CARES Act included the Relief for Workers Affected by Coronavirus

Act, which was set out Title II, Subtitle A. Section 2102.  This section created a

new temporary federal program called Pandemic Unemployment Assistance

---

[7] https://www.ncsl.org/ncsl-in-dc/publications-and-resources/president-trump-declares-state-of-emergency-for-covid-19.aspx (last visited February 8, 2021).

[8] *See https://home.treasury.gov/policy-issues/cares* (last visited February 1, 2021).

(PUA); in general, PUA provided up to 39 weeks of unemployment benefits, and also provided funding to states for the administration of the program. An individual receiving PUA benefits was also eligible to receive the $600 weekly benefit amount (WBA) under the Federal Pandemic Unemployment Compensation (FPUC) program if he or she were eligible for such compensation for the week claimed.[9]

12.   On December 27, 2020, the President signed into law the Consolidated Appropriations Act, 2021, including Division N, Title II, Subtitle A (Continued Assistance Act or Act).[10]  This Act amended certain provisions of the Emergency Unemployment Insurance Stabilization and Access Act (EUISAA), set out in Division D of the Families First Coronavirus Response Act (Pub. L. 116-127), the Coronavirus Aid, Relief, and Economic Security (CARES) Act (Pub. L. 116-136), and the Protecting Nonprofits from Catastrophic Cash Flow Strain Act of 2020 (Protecting Nonprofits Act) (Pub. L. 116-151), and created other new UI-related provisions (*id*).

13.   Many of the UI-related provisions in EUISAA and the CARES Act are now

---

[9] Department of Labor Unemployment Insurance Program Letter 16-20 Change 1, April 27, 2020 (https://wdr.doleta.gov/directives/attach/UIPL/UIPL_16-20_Change_1.pdf), last visited February 6, 2021.

[10] *See* https://www.congress.gov/116/bills/hr133/BILLS-116hr133enr.pdf (last visited February 1, 2021).

extended beyond their original expiration date of December 31, 2020, and the

Federal Pandemic Unemployment Compensation (FPUC) program, which

provided a supplemental weekly benefit of $600 through July 31, 2020, is resumed

for weeks of unemployment beginning after December 26, 2020, as a $300

supplement (*id.*).

### D. Federal Funding Received by Defendants

14.   As of January 23, 2021, the State of Louisiana had received the following

CARES Act Funding:

    a.   $12,708,754 – Emergency Unemployment Insurance Stabilization and

        Access Act (EUISAA) of 2020;

    b.   $638,345,071 – Pandemic Unemployment Assistance (PUA);

    c.   $5,995,310 – Emergency Relief for governmental entities and non-profits;

    d.   $4,318,672,183 – Federal Pandemic Unemployment Compensation (FPUC);

    e.   $58,675,122 – Temporary Full funding of First Week of Regular

        Compensation;

    f.   $161,515,542 - Pandemic Emergency Unemployment Compensation

        (PEUC).[11]

15.   Accordingly, the total amount of federal funds received by the State of

---

[11] https://oui.doleta.gov/unemploy/docs/cares_act_funding_state.html (last visited January 26, 2021).

Louisiana pursuant to the CARES Act, as of January 23, 2021, is over five billion dollars ($5,195,871,982). Of that amount, over four and a half billion dollars ($4,557,526,911) was specifically allotted for funding of unemployment benefits. *Id.*

### E. Claims for Unemployment Benefits in Louisiana

16.  Immediately after passage of the CARES Act in March 2020, the Louisiana Workforce Commission began to receive an unprecedented influx in claims for unemployment benefits; new claims rose from an average of 1,500 per week to 10,000 per week. As of March 31, 2020, the Commission stated that it was working to increase its capacity for claims processing.[12]

17.  When a statute is facially unambiguous, agencies tasked with implementation of the law must strictly comply with the language enacted by the Congress. When an agency acts in an arbitrary and capricious manner by creating its own set of procedural regulations, and such action prevents thousands of people – who are struggling to survive in the midst of a global pandemic - from receiving badly-needed relief granted to them by Congress, the agency has caused great

---

[12] 'No one was prepared for this': Crush of applicants delays Louisiana jobless claims amid coronavirus, Tyler Bridges, March 31, 2020, The New Orleans Advocate/Times-Picayune; https://www.nola.com/news/coronavirus/article_6d1f22ee-739e-11ea-97aa-3f8e46a96ef6.html (last visited January 26, 2021).

harm.  Awaiting a final decision from the agency, in this case, would not provide an adequate remedy, and would create yet more irreparable harm.

18.   The Commission has had ample opportunity to increase and train its staff; update its computer systems; and process claims; the Commission has received funds to alleviate the fiscal burden imposed by this necessity.[13]

19.   As a condition of receiving federal emergency grant money, the State of Louisiana was instructed to process claims immediately.  If a claimant was denied benefits, the State of Louisiana was obligated to "notify the applicant that the application for benefits has been received, identify the reason why the claim was not processed, and provide information about what steps the applicant can take to ensure the successful processing of the application."[14]

20.   Despite the ten (10) months between onset of the pandemic and the time of filing of this Petition, the Commission continues to withhold benefits, failing or refusing to disburse funds to eligible claimants.  The Commission's arbitrary and

---

[13] Emergency grants for State administration were authorized in an amount of up to one billion dollars ($1,000,000,000) as of May 5, 2020 (Unemployment Insurance Program Letter 13-20, Change 1, May 5, 2020
(https://wdr.doleta.gov/directives/attach/UIPL/UIPL_13-20_Change_1.pdf) (last visited February 1, 2021)).  In order to receive emergency grant funding, the State of Louisiana was required to take steps "to ease eligibility requirements and access to unemployment compensation for claimants" (*id.*).

[14] *Id.*

unlawful withholding of benefits has created financial uncertainty and distress for the very people whom the CARES Act was meant to assist.

21.   The Commission has failed to provide any meaningful recourse for claimants, including failing to identify the reason why the claim was not processed, failing to provide information about what steps the applicant could take to ensure successful processing, and/or by failing to process claim applications, and/or failing to provide meaningful access to procedures, including appealing adverse determinations.

22.   The Commission has withheld benefits from Plaintiffs in multiple contexts. by the time some Plaintiffs' claims for benefits had been processed in 2020, Plaintiffs had become entitled to payment of "back pay," in the form of benefits which had accrued but not yet been disbursed.  The CARES Act had retroactivity built in; the Act was signed into law on March 27, 2020, but the effective date for eligibility for unemployment, under the Act, was March 13, 2020.  The Department of Labor's April 27, 2020 letter to state workforce agencies provided the following guidance:

> An individual does not need to demonstrate good cause to backdate a PUA claim. Rather, the claim **must** be backdated to the first week during the Pandemic Assistance Period that the individual was unemployed, partially unemployed, or unable or unavailable to work

because of a COVID-19 related reason listed in section 2102(a)(3)(A)(ii)(I) of the CARES Act.[15]

23.   With respect to the CARES Act's provision for the $600 additional Weekly Benefit Amount, the Department of Labor allowed for retroactivity of benefits payments as well, explaining as follows:

> FPUC is payable to individuals who are otherwise entitled under state or federal law to receive regular UC for weeks of unemployment (including Unemployment Compensation for Federal Employees (UCFE) and Unemployment Compensation for Ex-Servicemembers (UCX)). FPUC is also payable to individuals receiving the following unemployment compensation programs: PEUC, PUA, EB, Short-Time Compensation (STC), Trade Readjustment Allowances (TRA), Disaster Unemployment Assistance (DUA), and payments under the Self-Employment Assistance (SEA) program.
> [….]
> States that are unable to immediately pay benefits the week following the execution of the agreement with the Department to operate the program must provide retroactive payments to individuals eligible for FPUC for the weeks they would have been entitled.[16]

24.   Some class members entitled to back pay have yet to receive full back payment; some Plaintiffs have not received payment at all.

25.   The Commission's failure to pay back pay to eligible claimants has caused the most damage to individuals entitled to receive compensation under the PUA program.

---

[15] Department of Labor Unemployment Insurance Program Letter 16-20 Change 1, April 27, 2020 (https://wdr.doleta.gov/directives/attach/UIPL/UIPL_16-20_Change_1.pdf), last visited February 6, 2021.
[16] https://wdr.doleta.gov/directives/attach/UIPL/UIPL_15-20.pdf (last visited February 6, 2021).

26.    Some Plaintiffs have made legitimate claims for benefits, and initially received benefits payments.  Subsequently, some of these Plaintiffs have been able to resume employment, albeit on a limited and part-time basis, due to COVID-19. These Plaintiffs remain eligible for benefits, in an amount adjusted for their partial income.[17]  However, Plaintiffs have been disqualified or have not received payment, due to the Commission's error.

27.    Some Plaintiffs have made legitimate claims for benefits, and also initially received payments.  Once their initial claims had been exhausted, these Plaintiffs remained eligible for extensions of benefits payments, and applied and were approved for Extended Benefits.  However, these Plaintiffs have yet to receive payment for their Extended Benefits claims.

28.    Some Plaintiffs have made legitimate claims for benefits, but have been inappropriately categorized as having received "overpayment of benefits" due to the Commission's error.  Claimants have been notified of "overpayment" by letters, which included statements that claimants could appeal the Commission's overpayment determination within fifteen (15) days.

---

[17] "The Department [of Labor] first defined "unemployment" in 1950 in its model for state legislation to meet the requirements of federal UC law.  The model defined "week of unemployment" as "any week during which [an individual] performs less than full-time work for any employing unit if the wages payable to [the individual] are less than the weekly benefit amount. (Manual of State Employment Security Legislation 1950)" (Unemployment Insurance Program Letter No. 10-20, March 20, 2020 https://wdr.doleta.gov/directives/attach/UIPL/UIPL_10-20.pdf (last visited February 1, 2021)).

29.    However, when claimants have contacted the Commission after receiving the letter, the Commission has informed that it will not even consider Plaintiffs' appeals for at least four months.  Some claimants have not been able to get through to the Commission by phone, and are unable to submit appeals online, due to the Commission's failure to update and maintain its computer systems.  Some claimants have also received additional letters, informing them that their tax refunds will be seized and credited to the alleged overpayment.

30.    Delays in claims processing have been attributed to the influx of fraudulent claims and necessity for verification of identity.[18]  However, this does not explain the delays in processing claims which have been delayed for months, some since the onset of the pandemic. Insofar as the Commission has been investigating possible fraudulent claims, the federal government has provided funding since at least May 11, 2020 to states to assist with detection and prevention of fraud, and has also provided states with access to technological tools and resources, in order to ensure efficient administration of claims.[19]

---

[18] ARKLaTex Residents Want Answers from La. Workforce Commission on delay in receiving Unemployment Benefits, Tayler Davis, January 28, 2021:
https://www.ksla.com/2021/01/25/arklatex-residents-wants-answers-la-workforce-commission-delay-receiving-unemployment-benefits/ (last visited March 8, 2021).

[19] The Department of Labor's UIPL No. 9-21, dated December 30, 2020
(https://wdr.doleta.gov/directives/attach/UIPL/UIPL_9-21.pdf)(last visited February 11, 2021, provides (in part) as follows:
UIPL No. 23-20, published on May 11, 2020, discusses program integrity for the UI system.
UIPL No. 28-20, published on August 31, 2020, provides states with funding to assist with

31.    Finally, since passage of the Continued Assistance Act on December 27, 2020, some Plaintiffs have submitted legitimate applications for benefits, but have yet to receive payment of benefits due and owing to them.[20]  The delay in implementing benefits payments under the new law is inexcusable, given the time and resources afforded to the Commission since onset of the COVID-19 pandemic.

32.    Unemployed claimants, desperately in need of assistance, have experienced issues in processing across the board.  Their claims have been processed incorrectly; online portals reflect incorrect information; the Commission's website is inaccessible, or the server crashes; claimants wait on hold for hours, only to be

---

efforts to prevent and detect fraud and identity theft and recover fraud overpayments in the PUA and PEUC programs.

[….]

ETA strongly encourages states to utilize the tools, resources, and services of the UI Integrity Center, funded by the Department and operated in partnership with the National Association of State Workforce Agencies. One of the key assets to support addressing fraud is the Integrity Data Hub (IDH), which includes a variety of data sets to prevent and detect fraud based on identity theft at the time of application, including an identity verification solution. ETA also encourages states to consult with the UI Integrity Center on data analytics and to prioritize IDH hits, as well as on other tools and solutions available through the private sector that complement the IDH. In UIPL No. 28-20, the Department explained its expectation that states connect to the IDH no later than March 31, 2021 and encouraged states to use their share of the funding provided through that UIPL to support IDH connection as soon as possible. There is also a range of other tools on the market that states should consider when combating fraud and ensuring program integrity.

[20] The State of Louisiana received money from the federal government to pay Extended Benefits under the CARES Act (*id.*).

disconnected by the Commission's telephone system, without ever having been able to speak to a representative.

33.    One expert, formerly chief economist at the Louisiana Workforce Commission, has opined that federal funding for staffing to states has been allocated largely to hiring of call center employees.[21]  However, the employees hired by the Commission have not been trained properly, if at all; they cannot process claims and as stated previously, problems caused by the Commission include that plaintiffs have waited on hold for hours, only to have their calls be disconnected by the Commission's telephone system; call center employees have provided incorrect information to plaintiffs, causing problems with plaintiffs' claims, rather than resolving issues; plaintiffs have been told that there is nothing that can be done about their claims, and that appeals will not be processed for months.

34.    The United States Department of the Treasury describes the purpose of the CARES Act and the 2021 supplemental legislation as follows: "[t]he Coronavirus Aid, Relief, and Economic Security (CARES) Act and the Coronavirus Response and Relief Supplemental Appropriations Act of 2021 provide ***fast and direct***

---

[21] Why Is It So Hard to Get Your Pandemic Unemployment Benefits?, Lisa Rowan, March 1, 2021: https://www.forbes.com/advisor/personal-finance/why-its-so-hard-to-claim-unemployment/ (quoting Ali Bustamante as former chief economist for the Louisiana Workforce Commission)(last visited March 8, 2021).

**economic assistance for American workers**" and families.[22]  The Commission

has thwarted this objective, depriving thousands of individuals across the State of

Louisiana of necessary economic assistance.

### F.  Specific Facts in Support of Plaintiffs' Claims for Denial of Due Process; Immediate and Irreparable Harm

35.    Brooke Plaisance, class representative and Plaintiff herein, was employed

with a commercial equipment repair company in March 2020.  Her employer, like

many thousands of businesses across the country, was forced to furlough

employees, due to the unprecedented interruption in revenue created by the

COVID-19 global pandemic.  Ms. Plaisance was unfortunately one of these

employees, and was furloughed on the last day of March, 2020.

36.    Ms. Plaisance submitted her application for unemployment benefits to the

Louisiana Workforce Commission on the day that she was furloughed.  The

Commission subsequently requested that Ms. Plaisance provide wage information,

which she promptly uploaded through her online portal, per the Commission's

requirements.  Otherwise, Ms. Plaisance has received no communication from the

Commission regarding any information necessary to process her claim.

37.    The Commission failed to pay any benefits to Ms. Plaisance.  Ms. Plaisance

---

[22] https://home.treasury.gov/policy-issues/cares (last accessed February 8, 2021) [emphasis added].

subsequently contacted the Commission several times by telephone to ask about the status of her claim; she was instructed to file new claims.  Ms. Plaisance subsequently filed two new claims for unemployment benefits.

38.   Almost a year later, Ms. Plaisance has yet to receive a single benefit payment on claims made pursuant to her April 1, 2020 furlough.  Ms. Plaisance's online account provides for some benefit weeks that her claim is "processing."  For other benefit weeks, Ms. Plaisance's benefit status provides "disqualified."

39.   Ms. Plaisance has received no communication from the Commission stating why she was disqualified for certain weeks of benefits; she has received no communication stating why certain benefits are still reflecting that they are "processing."

40.   Ms. Plaisance is unable to administratively appeal the Commission's failure to pay weekly benefits where the status for those weekly claims reflects that they are processing, because the appeals process is only available for final determinations.  Additionally, because Ms. Plaisance has not been provided any notice of reasons for disqualification for some weekly claims, she is effectively unable to appeal those determinations.

41.   Ms. Plaisance has also sent written communication to the Commission, by email, requesting resolution of her claim.  Ms. Plaisance has never received any response to this request.

42.  Ms. Plaisance has suffered economic distress and related injuries, and has incurred other damages, including emotional distress.

43.  Ms. Plaisance has not been provided any meaningful opportunity to be heard; has no recourse with the Commission, and is subject to ongoing harm as a result of the Commission's failure to pay benefits, which have now been due and owing for the better part of a year.

44.  Fredrick Bass, class representative and Plaintiff herein, was laid off from his job as a plant worker, as a direct result of COVID-19, in April 2020.

45.  Mr. Bass initially received PUA benefits.

46.  In August 2020, Mr. Bass began having issues with his claim when his online account denied him access to the weekly claim certification process.

47.  Mr. Bass called the Commission and spoke with a representative on the telephone; the representative informed him that he needed to file a new claim, or he would be permanently ineligible for benefits moving forward.

48.  As instructed by the Commission, Mr. Bass subsequently filed a new claim for unemployment compensation.

49.  When Mr. Bass' new claim was processed, the Commission incorrectly classified his claim as a regular unemployment claim, rather than PUA.

50.  The Commission then classified all benefits previously received by Mr. Bass as "overpayment."

51.   On January 7, 2021, Mr. Bass received notice that his claim had been re-classified as a PUA claim; however, on January 8, 2021, the Commission regenerated the "overpayment" status and attendant issues.

52.   The deadline for appealing the January 8, 2021 redetermination of overpayment was January 21, 2021; however, the option for appealing online was not available to Mr. Bass through his online account.

53.   Mr. Bass attempted to resolve the issue with the Commission, by calling to speak to a representative.  On one occasion, Mr. Bass was on hold for seven (7) hours; on another occasion, he was on hold for four (4) hours; his calls were then abruptly disconnected.

54.   Mr. Bass has not received payments of any of the unemployment compensation due him, for over twenty-three (23) weeks, as of the time of filing this petition.

55.   Mr. Bass has also been assessed with a debt of thousands of dollars by the Commission.

56.   Mr. Bass' damages were extensive; he was unable to pay for basic living expenses; was homeless for a time; and has incurred other damages, including emotional distress.

57.   Mr. Bass is unable to appeal the denial of benefits; has not been provided a

meaningful opportunity to be heard; and has no recourse with the Commission at this time.

58.    Amanda Coleman, class representative and Plaintiff herein, was employed as a healthcare provider, but was laid off in March 2020 due to COVID-19.

59.    Ms. Coleman was unaware that she was eligible for benefits for a period of time after separation from employment, but was prompted by her former employer to submit her claim.

60.    Ms. Coleman submitted her claim for unemployment benefits to the Commission in or around May 2020, and qualified for and received benefits.

61.    Ms. Coleman never received the backpay due her, from the time of separation from employment through the date of submission of her claim.

62.    Ms. Coleman continued to submit her weekly certifications and received weekly benefits until late December, 2020.

63.    Ms. Coleman received an (erroneous) overpayment determination notice from the Commission in the first week of January 2021.

64.    On January 9, 2021, Ms. Coleman submitted an appeal of the overpayment determination.

65.    A month later, on February 10, 2021, the Commission sent a letter to Ms. Coleman, acknowledging receipt of her appeal, and informing her that "an appeal hearing will be scheduled within the near future."

66.    As of the date of filing of the instant petition, no appeal hearing has been set in Ms. Coleman's case.

67.    Ms. Coleman has continued to submit her weekly claim certifications.

68.    Ms. Coleman's online account with the Commission notes that she is "disqualified" from benefits payments.

69.    Ms. Coleman has not received any of the unemployment benefits due her in approximately two months, as of the date of filing the instant petition.

70.    Ms. Coleman has suffered economic distress and related injuries, and has incurred other damages, including emotional distress.

71.    Ms. Coleman has not been provided a meaningful opportunity to be heard; has no recourse with the Commission at this time; and continues to suffer harm as a result of the Commission's withholding of benefits due her.

72.    Stephen Strick, class representative and Plaintiff herein, was self-employed in the construction business, working primarily on home remodeling.  After onset of the COVID-19 pandemic, he found himself unable to work, due to the resulting restrictions and complications.

73.    Mr. Strick was received PUA benefits in 2020, although he has never received the back pay owed him.

74.    Mr. Strick received an overpayment determination from the Commission for

PUA benefits received in 2020, based on the Commission's finding that he had not been eligible to receive the PUA benefits paid to him.

75.   Because the Commission's overpayment determination was incorrect, Mr. Strick submitted an appeal.

76.   Mr. Strick subsequently received additional incorrect overpayment determination notices for PUA benefits received in 2020.

77.   Mr. Strick did not submit additional appeals, believing that additional appeals would have been duplicative.

78.   The Commission disqualified Mr. Strick from eligibility for payment of benefits, providing that, because Mr. Strick had not submitted appeals in response to the subsequent, duplicative, incorrect notices of overpayment, Mr. Strick's overpayment determination had become final.

79.   Mr. Strick communicated with the Commission on the issue, promptly providing the information necessary to prove that he had been eligible to receive PUA benefits in 2020, and therefore that the overpayment determination had been made in error; a Commission representative informed Mr. Strick that all issues with his claim had been resolved, and he was eligible for payment of benefits.

80.   Now months later, Mr. Strick has yet to receive any payment of benefits, despite his continued eligibility and weekly certification of his claim.

81.   Mr. Strick has suffered economic distress and related injuries, and has

incurred other damages, including emotional distress.

82.   Mr. Strick is unable to appeal the denial of benefits; has not been provided a meaningful opportunity to be heard; and has no recourse with the Commission at this time.

83.   William Grieshaber, class representative and Plaintiff herein, was laid off from his long-time job an an assistant manager of a restaurant in Walker, Louisiana, just after the onset of the pandemic, due to COVID-19.  Mr. Grieshaber subsequently filed a claim for unemployment and received compensation.

84.   In January 2021, Mr. Grieshaber received a series of five (5) letters from the Commission, stating that he had been overpaid, and assessing him with a debt to the Commission, in the approximate amount of $18,000.00 (eighteen thousand dollars), comprising the full amount of all payments made to Mr. Grieshaber over an eight-month period of time.

85.   The Commission stated that Mr. Grieshaber had been ineligible to receive unemployment benefits because he had left his previous employment to take another job.

86.   Mr. Grieshaber, who had worked in the food service industry, as an assistant manager, in the same position for over seven (7) years prior to the onset of the pandemic, was laid off due to his employer's closing, and has been unemployed since.

87.    The Commission failed to notify Mr. Grieshaber of its (incorrect) eligibility

assessment for eight months, paying Mr. Grieshaber's benefits on a weekly basis,

and then suddenly terminating benefits and stating that Mr. Grieshaber is bound to

pay them all back.

88.    Commission representatives have suggested to Mr. Grieshaber that he

should request a waiver, which essentially requires that an individual claimant

provide evidence of finances and other information, and verify that he would not

have accepted funds had he known he was ineligible to receive them.  The waiver

request therefore requires that an individual admit that he does owe the incorrectly

assessed overpayment.[23]

89.    If Mr. Grieshaber submits an administrative appeal, according to multiple

Commission representatives, the appeal process will take over four months.

90.    Meanwhile, collections attempts will presumably continue; if Mr.

Grieshaber files his tax returns, any refund he is due may be seized to satisfy the

amount he has allegedly overpaid.

91.    Also in the interim, Mr. Grieshaber will not be receiving the compensation

---

[23] Section 262 of the Continued Assistance Act provides that states may waive overpayments under the Lost Wages Assistance (LWA) program when the individual is not at fault for the payment and repayment would be contrary to equity and good conscience. UIPL 9-21, December 30, 2020 (https://wdr.doleta.gov/directives/attach/UIPL/UIPL_9-21.pdf)(last visited February 11, 2021).

he is entitled to, and which is owed to him, due to the Commission's erroneous disqualification of his claim.

92.   Mr. Grieshaber has been placed in an untenable situation, in which he is essentially being forced to admit that he owes the Commission eighteen thousand dollars, by signing off on a waiver request.  If he does not do so, he will face collections, at a time when he is in a vulnerable financial position.

93.   Mr. Grieshaber has suffered economic distress and related injuries, and has incurred other damages, including emotional distress.

94.   Mr. Grieshaber's right to appeal the Commission's decision is meaningless, due to the time that processing the appeal will take.  Mr. Grieshaber has no recourse with the Commission at this time.

95.   Plaintiffs have suffered actual injury.  Defendants' failure to provide procedural due process with respect to payment of benefits has resulted in Plaintiffs' inability to pay for necessary expenses, such as rent; mortgages; basic utilities; and food.  Plaintiffs have been forced to move out of their homes, as a result of being unable to pay rent, or facing foreclosure actions; Plaintiffs have suffered termination of utilities and telephone services; have lost vehicles to foreclosure; have incurred late fees; and have lost necessary insurance coverage. Many Plaintiffs no longer have a good credit rating, which compounds their

financial hardship. Plaintiffs have incurred other damages, including, but not necessarily limited to, emotional distress.

96. For some Plaintiffs, unemployment compensation has been due for almost a year, as of the date of filing this complaint. For other Plaintiffs, compensation has been due for months.

97. In the context of the emergency nature of the relief contemplated by the CARES Act; the generous funding provided to the State of Louisiana to assist with administration; and the intervening ten-month period of time, the State of Louisiana has failed to issue benefits determinations with "the greatest promptness that is administratively feasible;" has failed to process appeals timely; and has frustrated the spirit and purpose of both the CARES Act and the Social Security Act's provisions; these provisions contemplate both timely and expedited release of desperately-needed benefits, which are due and owing to claimants, and expedited processing of benefits determinations and appeals.

## II.    REQUEST FOR ENTRANCE OF A TEMPORARY INJUNCTION, ENJOINING DEFENDANTS FROM FURTHER DELAYS IN CLAIMS AND APPEALS PROCESSING

98. Federal Rule of Civil Procedure 65(b) provides that the Court may issue a temporary restraining order, without notice to the adverse party or counsel, only if "(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before

the adverse party can be heard in opposition; and (B) the movant's attorney

certifies in writing any efforts made to give notice and the reasons why it should

not be required."

99.   Plaintiffs respectfully request that this Court consider their sworn statements

(Doc. 1-1 through Doc. 1-5), as submitted in conjunction with their Original

Complaint (Doc. 1), and all of the facts and law set forth therein, as though fully

and completely set forth and incorporated herein, in support of their request for

injunctive relief.

100. In this case, payments are now due to the Plaintiffs because Congress has

enacted a plan anticipated to provide relief during a time of national emergency.

Given the Supreme Court's finding that a seven-week delay was not reasonable;

the subsequent passage, by the Social Security Administration, of guidelines

contemplating a maximum of forty-five (45) days for processing appeals of regular

claims (i.e. claims not made during a national emergency/disaster); and the

CARES Act's contemplation of expedited claims processing and payment of

benefits, delays of weeks and months in processing claims and appeals are

definitely not reasonable.

101. Plaintiffs respectfully represent that there is no question that claims have

been delayed and have not been timely processed; the delays have been publicly acknowledged.[24]

102. Plaintiffs further represent that delay in payment of benefits represents an immediate and irreparable harm.

103. Generally speaking, withholding of funds, from a payee to whom they are owed, will always result in some damage.  In this case, where the funds so clearly have been allotted to meet an emergent need, contemplating assistance with basic living expenses during a national emergency, the harm is self-evident.

104. Plaintiff Brooke Plaisance is owed compensation from April 2020 through July 2020.  The withholding of her benefits caused Ms. Plaisance to suffer financial hardship.  The Commission's continued withholding of benefits causes continuing harm to Ms. Plaisance; she incurred debts during this time period which she still owes, and continues to be unable to pay them.  Ms. Plaisance has no other remedy available to her.

105. Plaintiff Fredrick Bass continues to be eligible for benefits, and continues to comply with all requirements, including submitting his weekly claim certifications.  The Commission's failure to pay benefits to Mr. Bass is due to an

---

[24] ARKLaTex Residents Want Answers from La. Workforce Commission on delay in receiving Unemployment Benefits, Tayler Davis, January 28, 2021: https://www.ksla.com/2021/01/25/arklatex-residents-wants-answers-la-workforce-commission-delay-receiving-unemployment-benefits/ (last visited March 8, 2021).

error in classification of which the Commission is aware, and has failed or refused

to rectify.  Mr. Bass has suffered harm, and continues to suffer harm as a result of

the Commission's continued withholding of benefits owed to him.  Mr. Bass has

no other remedy available to him.

106. Plaintiff Amanda Coleman has not received benefits owed her for

approximately two months, despite her continued eligibility and compliance with

all requirements, including submission of weekly claim certifications.  She is under

severe financial strain.  She has suffered harm, and continues to suffer as a result of

the Commission's failure to pay compensation due her.  Ms. Coleman has no other

remedy available to her.

107. Plaintiff Steven Strick has not received benefits due him for months, despite

his continued eligibility and compliance with all requirements.  He has suffered

harm, and continued to suffer as a result of the Commission's failure to pay

benefits due him.  Mr. Strick has no other remedy available to him.

108. Plaintiff William Grieshaber continues to be eligible for benefits, and

continues to comply with all requirements, including submitting his weekly claim

certifications.  The Commission's failure to pay benefits to Mr. Grieshaber is due

to an error in classification; however, the Commission has failed or refused to

rectify the error, or even to allow Mr. Grieshaber to address the issue.  Mr.

Grieshaber has suffered harm, and continues to suffer harm, as a result of

continued withholding of compensation due him.  Mr. Grieshaber has no other remedy available to him.

109. In the days since filing of Plaintiffs' Original Complaint in this matter (Doc. 1), undersigned counsel has received hundreds of phone calls, from individuals entitled to receive benefits, whose payments have been delayed for months; from individuals who have been incorrectly placed in an "overpayment" status, causing them to be assessed with crushing amounts of debt and causing all continued payments to be withheld; and from many other individuals, all of whom have one thing in common: their urgent claims for benefits are not being processed.

110.   The Defendants' failure to process claims in a timely fashion has resulted, and continues to result, in immediate and irreparable injury to the named Plaintiffs, and to hundreds, and likely thousands, of people, across the State of Louisiana.  All Plaintiffs have been denied procedural due process, and due process continues to be denied them, each day their claims are not processed.

110.   Plaintiffs also fear that the recent legislation (the Coronavirus Preparedness and Response Supplemental Appropriations Act, enacted on March 6), will create yet more delays in Defendants' processing of claims, and further damage to the Plaintiffs.

110. Plaintiffs will likely succeed on their claims as to denial of procedural due process.

111. Plaintiffs further represent that they continue to experience irreparable harm, as a result of Defendants' failure to provide due process to the Plaintiffs, and specifically as a result of Defendants' failure to pay compensation due to Plaintiffs.

112. Plaintiffs do not have an adequate remedy through the administrative process for resolution of their claims, as set forth hereinabove.

113. All named Plaintiffs have executed unsworn declarations ((Doc. 1-1 through Doc. 1-5), under penalty of perjury, pursuant to 28 United States Code Section 1746, verifying that all facts set forth in the Plaintiffs' Original Complaint, as those facts pertain to each Plaintiff, respectively, and as they are again set forth hereinabove, are true and correct.

114. Accordingly, Plaintiffs request that a temporary restraining order issue, without notice, prohibiting Defendants from: (1) any further delays in processing benefits determinations as to claims pending for more than thirty (30) days prior to entrance of said temporary restraining order; (2) any further delays in processing appeals pending for more than thirty (30) days prior to entrance of the temporary injunction; (3) any further delays in rectifying incorrect classification(s) of claims, including incorrect overpayment designations; (4) any further delays in payment of compensation due to a claimant as of any date more than thirty (30) days prior to entrance of the temporary injunction; and (5) in order to identify the members of the class, that in conjunction therewith, Defendants provide to this Court, within

ten (10) days of entrance of said injunction, the information necessary to identify the members of the class, including (1) those claimants to whom compensation is due, but has not been timely paid; (2) those claimants as to whom a determination of benefits has not been timely made; (3) those claimants whose appeals have not been timely processed; (4) those claimants who have been prevented from timely submission of appeals due to errors in the Commission's system of administration; and (5) those claimants who have been assessed with overpayment of benefits.

## III.    PRAYER FOR RELIEF

131.    Plaintiffs, on behalf of themselves and all others similarly situated, request as follows:

1.    That an immediate injunction issue, ordering Defendants to refrain from any further delays in processing benefits determinations as to claims pending for more than thirty (30) days prior to entrance of injunction; any further delays in processing appeals pending for more than thirty (30) days prior to entrance of the temporary injunction; any further delays in rectifying incorrect classification(s) of claims, including incorrect overpayment designations; any further delays in payment of compensation due to a claimant as of any date more than thirty (30) days prior to entrance of the temporary injunction; and further, that in conjunction therewith, Defendants provide to this Court, within ten (10) days of entrance of said injunction, the following information:

a.      Identification of all claims on file with the Louisiana Workforce Commission, as to which benefits are due as of any date thirty (30) days or more prior to the date of entrance of a temporary injunction, for which funds have not yet been released;

b.      Identification of all claims on file with the Louisiana Workforce Commission, for which a final benefits determination has not been made, as to any claim(s) submitted more than thirty (30) days prior to the date of issuance of the temporary injunction;

c.      Identification of all claims on file with the Louisiana Workforce Commission, for which a claimant has received an adverse determination, but has been prevented from appealing due to any error in the Commission's system of administration, as to any claim(s) submitted since March 13, 2020;

d.      Identification of all claims on file with the Lousiana Workforce Commission, as to which an overpayment determination has been made by the Commission, at any time since November 1, 2020, on the basis of a claimant's ineligibility for PUA benefits;

e.      Identification of all claims on file with the Lousiana Workforce Commission, as to which an overpayment determination has been made since November 1, 2020, on the basis of a claimant's ineligibility for regular unemployment benefits.

2.      That Defendants be served with citation and notice of said temporary injunction, and that, after hearing, Plaintiffs' request for injunctive relief be granted, and an injunction issue, and Defendants be enjoined from any further delays in in processing claims and appeals;

3.      That Plaintiffs be awarded any and all relief to which they may be entitled, under law or in equity.

Respectfully submitted,

_____
Ellyn J. Clevenger (Bar Roll No. 32395)
Wendy Manard (Bar Roll No. 29622)
1100 Poydras Street
Suite 2610
New Orleans, Louisiana 70163
504.585.7777
wendy@wmanard.com
ellyn@wmanard.com

ATTORNEYS FOR PLAINTIFFS