**STATE OF LOUISIANA**

**PARISH OF EAST BATON ROUGE**

### AFFIDAVIT OF RENITA WILLIAMS

BEFORE ME, the undersigned Notary Public, personally came and appeared:

### RENITA WILLIAMS

who, after being duly sworn, did depose and say that:

1. I am over 18 years of age, of sound mind, and capable of making this affidavit.

2. The facts stated in this affidavit are true and correct and are within my personal knowledge.

3. I am employed as the Deputy Secretary of the Louisiana Workforce Commission (LWC), and have worked in the Unemployment Insurance field for 10.5 years, 10 of which were spent with the LWC.

4. In addition to the LWC, I have worked for National Association of State Workforce Agencies (NASWA), as a Senior UI Subject Matter Expert. With NASWA, I was the state liaison for U.S. Department of Labor (USDOL) Region 4, which includes Louisiana. My work was focused on program integrity issues, i.e., fraud.

5. Additionally, I served on the USDOL monitoring review team for the implementation of the CARES Act and Continued Assistance Act programs. The monitoring review teams are tasked with auditing states' implementation of the aforementioned programs to ensure compliance.

6. As part of this work, we provided states with technical assistance to address and overcome any findings that might appear relative to their implementation of the programs.

7. I also served as backup for the subject matter expert to the attorney group; I hold a Juris Doctorate from Southern University Law Center (2011).

EXHIBIT

2

8. In my tenure with the LWC, I have served in the following roles: Assistant Secretary of the Unemployment Insurance (UI) Division; Administrative Law Judge, Managing Administrative Law Judge of the Louisiana Board of Review, Chief of UI Support, and Office of Regulatory Services Specialist.

9. Generally speaking, the Unemployment Insurance program provides benefits to individuals who are unemployed through no-fault of their own.

10. The LWC cannot assume eligibility on any initial claim for benefits, and must review all claims in order to determine whether there is fault on the part of a claimant in connection with their separation from employment, which could result in a disqualification for benefits.

11. Thus, when a claim is filed, state unemployment agencies, like LWC, conduct informal fact-finding proceedings to discover facts that may affect the claimant's eligibility for benefits.

12. The fact-finding process consists of, at a minimum:

    i.   sending notice of the claim to the employer, requiring that the employer furnish a response within 10 days of the notice, and

    ii.  contacting the claimant and/or the employer for rebuttal or explanation of inconsistent versions of the facts provided by either party.

13. The Unemployment Insurance program further requires individuals to have demonstrated sufficient job attachment by meeting certain monetary eligibility requirements, as established by state statute.

14. The claimant must also demonstrate that he or she is able and available for work and actively seeking employment.

15. Notably, at the very outset of the pandemic, even before passage of the CARES Act, the LWC petitioned the Governor for an Executive Proclamation using his emergency powers, to suspend the requirement under La. R.S. 23:1600 that claimants register and search for work each week.

16.  The Governor issued a Proclamation to this effect and this suspension, as well as other regarding unemployment insurance were extended numerous times in light of the realities of the labor market in the pandemic.

17. Typically, Federal regulations mandate that only state merit-system employees may make determinations or decisions relative to unemployment insurance claims.

18. Stated otherwise, absent a waiver of applicable federal regulations, the LWC is not permitted to allow contract workers to may make determinations or decisions relative to unemployment insurance claims.

19. The state unemployment system's business requirements were designed to facilitate all of the above principles of the UI program along with episodic events such as disaster unemployment assistance. Thus, the LWC would usually administer, at most two programs at any given time UI program as disaster unemployment assistance.

20. Accordingly, when the Emergency Unemployment Insurance Stabilization and Access Act (EUISAA) and the Coronavirus Aid, Relief, and Economic Security (CARES) Act were signed into law, creating new federal benefits program, LWC's systems, like all other states' UI benefits systems required extensive modifications to account for federal programs that permitted self-certification, without documentation, and for which no precedent or system infrastructure existed.

21. Congress established multiple, distinct  unemployment assistance programs to assist those who became unemployed due to COVID-19:

      i. **Pandemic Emergency Unemployment Compensation (PEUC):** Individuals who have exhausted benefits on their unemployment claim and are still unemployed due to COVID-19 may qualify for PEUC.

      ii. **Pandemic Unemployment Assistance (PUA):** Individuals who do not qualify for state-funded unemployment benefits may qualify for PUA.

      iii. **Federal Pandemic Unemployment Compensation (FPUC):** Individuals who qualify for at least $1 in unemployment benefits under the various programs can get a supplemental payment in

addition to payment of state or federal unemployment compensation.

22. With the addition of pandemic related unemployment programs, LWC has been administering eight distinct benefits programs using systems that were designed to accommodate a maximum of two programs and even then only for a more finite period.

23. The federal legislation standing alone did not provide a framework for implementation of the federal pandemic unemployment programs, and was not sufficient for states to begin programming their benefits system.

24. Implementation of the legislation required extensive guidance from the United States Department of Labor (USDOL), which would come out in the form of Unemployment Insurance Program Letters (UIPLs).

25. Because of the fast pace at which federal legislation was enacted, at times, the USDOL had difficulty providing complete, real-time guidance on the programs.

26. As initial and continued claims shattered historic milestones, states remained burdened by the restriction noted in Paragraphs 13 and 14, *supra.* could only use existing state merit staff to respond to the onslaught of claims. The USDOL ultimately issued guidance authorizing states to use non-merit staff to adjudicate UI claims, but only after days had passed and the states had already operated short staffed for the initial influx of claims.

27. Even with flexibilities allowed, states are still required to determine initially and at every quarter change whether claimants qualify for regular state unemployment insurance benefits prior to determining the claimant eligible for benefits under any federal program.

28. Additionally, the USDOL did not relax or waive the states' role in ensuring Program Integrity. In fact, the USDOL stressed that "states play a fundamental role in ensuring the integrity of the UI program. While states have been provided some flexibilities as a result of COVID-19, those flexibilities are generally limited to dealing with the effects of COVID-19…. States must ensure that individuals only receive benefits in accordance with these statutory provisions."

29. Eligibility for the Pandemic Unemployment Assistance program (PUA) is determined on a week-to-week basis. In order to be eligible, the claimant must

certify that he or she is unemployed for one of the reasons enumerated in aa-kk of the CARES Act 2102(a)(3)(A)(ii)(I)(aa)-(kk).

- The individual has been diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and is seeking a medical diagnosis.

- A member of the individual's household has been diagnosed with COVID-19.

- The individual is providing care for a family member or a member of the individual's household who has been diagnosed with COVID-19.

- A child or other person in the household for which the individual has primary caregiving responsibility is unable to attend school or another facility that is closed as a direct result of the COVID-19 public health emergency and such school or facility care is required for the individual to work.

- The individual is unable to reach the place of employment because of a quarantine imposed as a direct result of the COVID-19 public health emergency.

- The individual is unable to reach the place of employment because the individual has been advised by a health care provider to self-quarantine due to concerns related to COVID-19.

- The individual was scheduled to commence employment and does not have a job or is unable to reach the job as a direct result of the COVID-19 public health emergency.

- The individual has become the breadwinner or major support for a household because the head of the household has died as a direct result of COVID-19.

- The individual has to quit his or her job as a direct result of COVID-19.

- The individual's place of employment is closed as a direct result of the COVID-19 public health emergency.

30. By directive of the USDOL, states are required to have claimants certify their eligibility each week, and weeks for which a COVID-19-related reason is not identified, the individual is not eligible for payment.

31. FPUC is a supplemental payment in addition to payment of state or federal unemployment compensation. The LWC must still determine whether a claimant is eligible for an underlying benefit program before paying Federal Pandemic Unemployment Compensation (FPUC).

32. In December 30, 2020 guidance, following the December 27, 2020 enactment of the Consolidated Appropriations Act, 2021, including Division N, Title II, Subtitle A (Continued Assistance Act or Act), the USDOL altered the requirements associated with PUA, placing greater burden on the states, including:

     i. Adding a new requirement that any individual that receives a payment of PUA after the date of enactment (December 27, 2020) is required to provide (and thus states are required to receive and properly route) documentation substantiating employment or self-employment, or the planned beginning of employment or self-employment.

     ii. Adding a new requirement for states to verify identity of applicants, states must include procedures for identity verification or validation and for timely payment, to the extent reasonable and practicable, for claims filed on or after January 26, 2021.

     iii. Individuals must provide (and thus states must receive) a self-certification that their unemployment, partial unemployment, or inability or unavailability to work is specifically attributable to one or more of the COVID-19 related reasons specified in section 2102(a)(3)(A)(ii)(I)(aa) through (kk) of the CARES Act, and must identify that specific reason, for each week that PUA is claimed. If a claimant did not identify a COVID-19 reason and certify his week-to-week eligibility for PUA, then he or she may not be eligible for benefits.

33. The reality of UI claims processing is that claims can vary such that there is no one-size-fits all approach that could be used to adjudicate unemployment benefit claims en masse.

34. In addition to the steady flow of claims being processed by LWC, LWC is tasked with ferreting out fraudulent claims for unemployment benefits and maintaining program integrity.

35. Unfortunately, just as the pandemic and related changes in eligibility requirements and relaxation of certain requirements have increased the number of legitimate claims, it has likewise increased fraudulent activity.

_Renita Williams_

**RENITA WILLIAMS**

SWORN TO AND SUBSCRIBED before me, Notary Public, at East Baton Rouge, Parish, Louisiana on this 26th day of March, 2021.

_Meridith g. Trahant_

**NOTARY PUBLIC**

Printed Name: **Meridith J. Trahant**
My Commission Expires: **Upon Death**
Notary No.: **30097**

bar

7