## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**BROOK PLAISANCE, ET AL.**                 **CIVIL ACTION**

**VERSUS**                           **NO. 21-121-JWD-EWD**

**STATE OF LOUISIANA, ET AL.**

## RULING AND ORDER

This matter comes before the Court on the *Motion for Judgment on the Pleadings to Dismiss Ava Cates in Her Official Capacity as Secretary of the Louisiana Workforce Commission* (the "*Motion*") filed by Ava Cates ("Cates") in her official capacity as the Secretary of the Louisiana Workforce Commission ("LWC").[1] The *Motion* is opposed.[2] As Plaintiffs do not sufficiently allege that Cates is responsible for a custom, policy, pattern, and practice that resulted in a constitutional violation,[3] fail to establish a procedural due process claim, and because there is no private right of action under 42 U.S.C. § 503(a), all federal claims against Cates are dismissed with prejudice.[4]

### I.   BACKGROUND

Brook Plaisance ("Plaisance"), along with the other named Plaintiffs ("Plaintiffs"),[5] brought this proposed class action pursuant to 42 U.S.C. § 1983 alleging violations of their Fourteenth Amendment Due Process rights and violations of the "when due" clause of 42 U.S.C.

---

[1] R. Doc. 67. Cates was previously referred to as "Ava Dejoie."
[2] R. Doc. 72. Cates has also filed a Reply. R. Doc. 74.
[3] R. Doc. 45. Plaintiffs First Amended Class Action Complaint, Request for Temporary Injunction After Hearing, and Permanent Injunctive and Declaratory Relief on behalf of Themselves and Others Similarly Situated is the operative complaint in this matter.
[4] Cates is the only remaining defendant. *See* R. Docs. 45 & 48.
[5] The other named Plaintiffs are Frederick Bass ("Bass"), Amanda Coleman ("Coleman"), and Stephen Strick ("Strick"). As Bass has filed a Motion to Withdraw as Named Plaintiff (R. Doc. 91), and Defendants have indicated they do not object to his withdrawal as a named plaintiff (R. Doc. 99), Bass's claims are not discussed in this Ruling and Order. The Motion to Withdraw as Named Plaintiff also seeks to withdraw William Greishaber, but he is not named as a plaintiff in the operative complaint and has already been terminated from this action. *See* R. Doc. 45.

§ 503(a)(1).[6]  Plaintiffs' claims arise from difficulties they experienced obtaining unemployment benefits from the LWC during the COVID-19 pandemic, specifically in 2020 and 2021.  As noted by Plaintiffs, the COVID-19 pandemic caused the national rate of unemployment to "skyrocket," and in April 2020 Louisiana's unemployment was at a historic rate of 15.1%.[7]  By Plaintiffs' estimates, as of May 2020, approximately half a million Louisianians received some form of unemployment benefit.[8]

Due to record unemployment across the nation, on March 27, 2020, the United States Congress enacted the Coronavirus Aid, Relief, and Economic Security ("CARES") Act.[9]  The CARES Act expanded eligibility for unemployment benefits to those not ordinarily eligible.[10] The CARES Act also created several new programs to provide expanded relief, including up to thirty-nine (39) weeks of unemployment benefits,[11] an additional thirteen (13) weeks of benefits for those who had exhausted unemployment benefits under state law,[12] an additional $600.00 per week in addition to state benefits to which the individual was entitled,[13] and an additional $100 per week for workers with $5,000 or more per year in net earnings from self-employment.[14]  The American Rescue Plan extended these programs through September 4, 2021.[15]

Plaintiffs had varied experiences with obtaining benefits during the COVID-19 pandemic: Plaisance was never able to obtain state benefits and has not received a determination as to her

---

[6] *See* R. Doc. 45.  42 U.S.C. § 503(a)(1) provides, in pertinent part: "The Secretary of Labor shall make no certification for payment to any State unless he finds that the law of such State, approved by the Secretary of Labor under the Federal Unemployment Tax Act [26 U.S.C. 3301 et seq.], includes provision for – (1) Such methods of administration… as are found by the Secretary of Labor to be reasonably calculated to insure full payment of unemployment compensation when due …."

[7] R. Doc. 45, p. 5.

[8] *Id.*, pp. 5-6.

[9] *Id.*, p. 6.

[10] *Id.*

[11] This was known as Pandemic Unemployment Assistance ("PUA").  R. Doc. 45, p. 6.

[12] This was known as Pandemic Emergency Unemployment Compensation ("PEUC"). *Id.*

[13] This was known as Federal Pandemic Unemployment Compensation ("FPUC").  *Id*, p. 7.

[14] This was known as the Mixed Earners Unemployment Compensation ("MEUC") Program. *Id.*

[15] R. Doc. 45, p. 7.

2

eligibility;[16] Coleman received benefits but not backpay to the date of her lay off and her benefits were discontinued when she was improperly issued an overpayment notice;[17] and Strick received PUA benefits but was later determined to be ineligible, resulting in overpayment notices. Plaintiffs also complain about the claims handling process, including the length of time and other difficulties in lodging an appeal from a denial or discontinuation of benefits, and the lack of notice prior to termination.

## II.    LAW & ANALYSIS

### A.  Standard of Review

Fed. R. Civ. P. 12(c) provides that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." Entry of judgment on the pleadings is proper if the material facts are not in dispute and the court can render judgment on the merits by looking to the substance of the pleadings and any judicially noticed facts.[18] The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6).[19]

In *Bell Atlantic Corp. v. Twombly*,[20] and *Ashcroft v. Iqbal*,[21] the Supreme Court clarified the standard of pleading that a plaintiff must meet to survive a motion to dismiss pursuant to Rule 12(b)(6). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level."[22] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[23] "A claim has facial

---

[16] R. Doc. 45, pp. 19-21.
[17] *Id.*, pp. 23-25.
[18] *Linicomn v. Hill*, 902 F.3d 529, 533 (5th Cir. 2018).
[19] *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002)).
[20] 550 U.S. 544 (2007).
[21] 556 U.S. 662 (2009).
[22] *Twombly*, 550 U.S. at 555.
[23] *Iqbal*, 556 U.S. at 678 (internal quotation marks and citations omitted).

3

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[24]  It follows that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' "[25] "Where a Complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' "[26]

On a Rule 12(c) motion, the Court can consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference and matters of which a court may take judicial notice."[27]  The Court takes judicial notice of the Legislative Auditor's report introduced by Cates.[28]

### B.  Plaintiffs Have Not Sufficiently Alleged a Custom, Practice, or Pattern

It has previously been determined in this case that the only federal claim over which this Court has jurisdiction is Plaintiffs' official capacity claim against Cates for prospective injunctive relief.[29] Official-capacity suits, as opposed to individual capacity suits, "generally represent only another way of pleading an action against an entity of which an officer is an agent." To be found

---

[24] *Id.*

[25] *Id.* at 679.

[26] *Id.* at 678 (internal quotation marks omitted).

[27] *Turner v. U.S.*, No. 13-932, 2013 WL 5877358, at *3 (S.D. Tex. Oct. 31, 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

[28] R. Doc. 67-2.  *In re Katrina Canal Breaches Consol. Lit.,* 533 F. Supp. 2d 615, 632 (E.D. La. 2008) ("The Fifth Circuit has determined that courts may take judicial notice of governmental websites." (quotation omitted)); *see Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (finding that "the district court took appropriate judicial notice of publicly-available documents and transcripts produced by the FDA, which were matters of public record directly relevant to the issue at hand"). While Plaintiffs acknowledge that the Court may properly take judicial notice of publicly available documents produced by a state agency, they argue that "the Auditor's analysis of improper unemployment compensation payments is irrelevant to whether Plaintiffs have stated a claim that Defendant failed to provide adequate and timely process in administering unemployment compensation." R. Doc. 72, p. 10. As the figures in the Auditor's report are relevant to the analysis in this opinion, the Court takes judicial notice of the report.

[29] R. Doc. 48, p. 7 ("Therefore, Plaintiffs' suit for prospective, injunctive relief may proceed against Secretary [Cates]. However, *Ex Parte Young* does not permit suits against the state or arms of the state—only against state offices. Therefore, the Commission must be dismissed.").

liable on an official capacity claim under Section 1983 the policy or custom at issue must be the moving force behind the alleged constitutional deprivation.[30] The Supreme Court has explained the difference between the claims, thusly:

> On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a "'moving force'" behind the deprivation; thus, in an official-capacity suit the entity's "policy or custom" must have played a part in the violation of federal law.[31]

Plaintiffs allege, generally, that the "[d]efendants have a custom, policy, pattern and practice of failing to: a) complete the process of determining eligibility for Unemployment Compensation ('UC'); b) provide adequate notice of a determination of eligibility for UC or termination from UC; and c) maintain a constitutionally sufficient process for seeking administrative review of agency actions."[32] Plaintiffs' Amended Complaint alleges that Cates, as Secretary of LWC, "exercises authority to administer and enforce the laws and regulations applicable to LWC, including federal and state law and regulation pursuant to the CARES Act[.]"[33]

Plaintiffs do not point to any written policy, implemented by Cates or otherwise, that caused the alleged constitutional violations in this case. Because there are no written policies about which Plaintiffs complain, they must demonstrate a persistent, widespread practice of officials or employees that is so well settled it constitutes a custom that fairly represents the policy.[34]  Further,

---

[30] *Williams v. Wallace*, No. 09-892, 2010 WL 59216, at *1 (W.D. La. Jan. 4, 2010) (citing *Kentucky v. Graham*, 473 U.S. 159 (1985)).
[31] *Graham*, 473 U.S. at 166 (cleaned up) (emphasis in original).
[32] R. Doc. 45, p. 12 (footnote omitted).
[33] *Id.*, pp. 3-4.
[34] *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)).  Although many of the cases cited in this opinion are decided under a theory of *Monell* liability for municipalities, Plaintiffs have only alleged constitutional violations based on a custom, policy, and pattern.  While Plaintiffs argue that the *Monell* standard should not apply in this case because *Monell* is only applicable to municipalities, Plaintiffs have not explained why cases addressing the requirements to establish a custom under *Monell*

the description of the policy or custom and its relationship to the underlying constitutional violation must be more than conclusory.[35]

### 1.  Plaintiffs' Claims[36] Are Not Sufficiently Similar

When a plaintiff is relying on a persistent, widespread practice to demonstrate a "policy," the plaintiff must show that the challenged "acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice."[37]  In other words, an official policy may be shown by demonstrating a "persistent, widespread practice of . . . officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy."[38]  The Fifth Circuit has emphasized that a custom can be inferred only from a pattern involving "sufficiently numerous prior incidents, as opposed to isolated incidents,"[39] and these incidents must be sufficiently similar and specific to the one that caused the plaintiff's injuries.[40]  Further, the incidents used to establish a pattern "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the

---

would not be instructive, nor what the proper standard should be to determine whether Plaintiffs have adequately alleged a custom if it is not these cases. Accordingly, the Court finds that cases addressing the standard to establish a custom, including cases addressing *Monell* liability, are instructive.

[35] *Fraire v. City of Arlington*, 957 F.2d 1268, 1278 (5th Cir. 1992).

[36] The three named Plaintiffs presently before the Court have the only live claims in this action.  *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 250 (5th Cir. 2020) ("What brings putative class members before the court is certification.") (citing *Police & Ret. Sys. Of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 n.22 (2d Cir. 2013) (noting "until certification there is no class action but merely the prospect of one; the only action is the suit by the named plaintiffs")).  A conclusory allegation as to frequency is not enough to establish a custom; as stated below, though there are alternatives to providing specific examples, Plaintiffs have not alleged any of these relevant alternatives.

[37] *See Estate of Henson v. Wichita Cnty., Tex.*, 795 F.3d 456, 465 (5th Cir. 2015) (quoting *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996) (internal quotation marks omitted)).

[38] *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 810-11 (5th Cir. 2017) (citation and internal quotation marks omitted).

[39] *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009) (cleaned up).

[40] *See id.*; *see also Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).

governing body of knowledge that the objectionable conduct is the expected, accepted practice[.]"[41]

     To prove that a custom exists, Plaintiffs have offered three individuals' experiences attempting to obtain benefits from LWC during the COVID-19 pandemic:[42]

- Plaisance applied for unemployment benefits but allegedly never received any benefits; for some claims weeks Plaisance's benefit status provides "disqualified," and for others, the status is "processing." Plaisance has not received a final determination, so the appeals process is unavailable.[43]

- Coleman applied for benefits a few months after she was laid off and received benefits from approximately May 2020 through December 2020 but never received backpay for the time from when she was laid off until she applied for benefits. In January 2021, Coleman received an overpayment determination, for which she lodged an appeal, which had not been heard as of the filing of the Amended Complaint.[44]

- Strick applied for and received benefits during 2020, including PUA benefits, but it was later determined that he was ineligible for PUA benefits, so LWC issued an overpayment notification. Strick appealed the determination, but then received additional overpayment determination notices. Strick did not appeal the allegedly duplicative overpayment determination notices, so he was disqualified from

---

[41] *Peterson*, 588 F.3d at 850 (quoting *Webster*, 735 F.2d at 842) (internal quotation marks omitted).
[42] R. Doc. 45, pp. 19-26.
[43] *Id.*, pp. 20-21.
[44] *Id.*, pp. 23-24.

eligibility for future benefits. However, Strick thereafter contacted LWC, resolved all issues, and now awaits reinstated unemployment benefits.[45]

Plaintiffs' claims are not sufficiently similar to demonstrate a custom: one plaintiff never received any benefits; two received overpayment notifications, one who never appealed the notification and was assessed a debt, and the other, who is awaiting an appeal hearing; and the final plaintiff completely resolved the issues he had with LWC, but payments were not yet reinstated.[46] Even if all three Plaintiffs had suffered the same action with the same consequence, Plaintiffs have not shown enough frequency to establish a custom.

### 2.  Plaintiffs' Claims Are Not Sufficiently Numerous

The Fifth Circuit has further instructed that whether a pattern has been adequately pled is highly dependent on "context."[47]  In the context of evaluating the sufficiency of a custom, pattern, or practice to establish an unwritten policy, the Fifth Circuit has found that twenty-seven (27) incidents of excessive force over four (4) years in a large police department did not amount to a custom considering the department's size and the fact that the department investigated each incident.[48]  In another case, the Fifth Circuit found that eleven (11) incidents over three (3) years was also insufficient.[49]  However, a district court has found that twelve (12) shootings in the same year as the shooting at issue—along with other facts regarding prior shootings—were sufficient to infer a persistent, widespread practice at the motion to dismiss stage.[50]

---

[45] *Id.*, pp. 25-26.
[46] *See, e.g.*, *Edwards v. Oliver*, No. 17-1208, 2019 WL 4603794, at *6 (N.D. Tex. Aug. 12, 2019) (incidents of a warrantless search and shooting at an animal were not similar enough to shooting resulting in death of a person to establish a custom existed to "shoot first and ask questions later.").
[47] *Peterson*, 588 F.3d at 851-52 & n.4.
[48] *Id.* at 852.
[49] *Pineda*, 291 F.3d at 329.
[50] *Flanagan v. City of Dallas, Tex.*, 48 F. Supp. 3d 941, 954 (N.D. Tex. 2014).

Here, we have three incidents where some alleged error was made regarding payment of benefits, resulting in payments not issued or debts assessed due to overpayment. To put this in context, from March 28, 2020 through December 31, 2020, 672,305 individuals received federal unemployment benefits and 479,194 individuals received state unemployment benefits in Louisiana.[51] Considering the large number of individuals who were paid benefits, three varied instances of error that caused some question as to eligibility and/or resulted in non-payment/overpayment notifications out of the hundreds of thousands of Louisiana citizens who were paid benefits falls far short of establishing a custom. The sample provided by Plaintiffs is simply too small to demonstrate a pattern sufficient to show a custom or policy.[52]

Finally, the Court recognizes that Plaintiffs "need not provide 'specific examples…to meet the "condition or practice" element.' "[53] However, Plaintiffs must provide *something* other than conclusory assertions; ultimately, the allegations must be sufficient to find a *de facto* policy.[54] In cases where specific examples were lacking, other assertions may suffice to demonstrate a practice, such as allegations regarding public reports demonstrating the unconstitutional practice.[55]

Here, Plaintiffs have only provided conclusory allegations and a handful of specific examples that are neither sufficiently similar nor numerous to demonstrate a pattern that rises to

---

[51] R. Doc. 67-2, p. 6. Plaintiff objects to the Court taking judicial notice of the report from the Legislative Auditor attached to the *Motion*, which establishes these figures. R. Doc. 72, pp. 8-11. Even if Plaintiffs' allegation was used that over 500,000 individuals in Louisiana received unemployment benefits by May 2020 (R. Doc. 45, pp. 5-6), Plaintiffs' three experiences do not show the frequency necessary to establish a custom.

[52] *See Khansari v. City of Houston*, No. 13-2722, 2015 WL 6550832, at *12 (S.D. Tex. Oct. 28, 2015) (finding that the sample of events, which included seven (7) incidents of taser use over thirty-two (32) months, was too small to support a pattern of illegality).

[53] *Moore v. LaSalle Mgmt. Co.*, 41 F.4th 493, 509 (5th Cir. 2022) (quoting *Montano v. Orange Cnty.*, 842 F.3d 865, 876 (5th Cir. 2016)).

[54] *Forster v. Bexar Cnty.*, No. 21-765, 2022 WL 2820857, at *15 (W.D. Tex. July 19, 2022) (though the *de facto* policy language is specifically stated in relation to proving a condition or practice in the context of a pre-trial detainee's claims, the same rationale applies to demonstrating a custom when there is no written policy as the standard is still demonstrating a pattern that is sufficiently extended or pervasive to prove an intended condition or practice).

[55] *See Jordan v. Gautreaux III*, No. 21-48, 2022 WL 895720, at *28-29 (M.D. La. March 25, 2022) (deGravelles, J.).

9

the level of a policy or custom.[56]  Proving a pattern is a heavy burden,[57] and here, Plaintiffs have

not met that burden.

### C. Alternatively, Plaintiffs' Claims are Subject to Dismissal because They Have Not Stated a Procedural Due Process Violation and because There is No Private Right of Action under 42 U.S.C. § 503(a)

#### 1. Plaintiffs Cannot State a Due Process Claim with Respect to Denial of CARES Act Benefits, Including PUA and FPUC

Several courts have found there is no private right of action under the CARES Act.[58]

Plaintiffs point out that the CARES Act was meant to provide "*fast and direct* economic assistance

for American workers and families" and note details regarding CARES Act funding and the like.[59]

To the extent Plaintiffs assert any claim arising from the CARES Act, such a claim fails.

Additionally, it is questionable whether Plaintiffs have a property interest in CARES Act

benefits. "The procedural component of the Due Process Clause does not protect everything that

might be described as a 'benefit': To have a property interest in a benefit . . . [one] must . . . have

a legitimate claim of entitlement to it."[60]  "Our cases recognize that a benefit is not a protected

entitlement if government officials may grant or deny it in their discretion."[61]  Numerous courts

around the county, including courts in the Fifth Circuit, have held that there is no property interest

---

[56] *See Schaefer v. Whitted*, 121 F. Supp. 3d 701, 718-719 (W.D. Tex. 2015) (dismissing claims of a policy or custom because the complaint was a reformulation of the elements of a claim for municipal liability devoid of factual enhancement and without specific examples of persistent and widespread abuse).

[57] *Robertson v. Coahoma Cnty., Miss.*, No. 07-78, 2008 WL 3334091, at *3 (N.D. Miss. Aug. 6, 2008).

[58] *See Moss v. Lee*, No. 21-561, 2022 WL 68388, at *5 (M.D. Tenn. Jan. 6, 2022) ("the CARES Act does not create either an explicit or implied private cause of action."); *see also Autumn Court Operating Co. v. Healthcare Ventures of Ohio*, No. 20-4901, 2021 WL 325887, at *5 (S.D. Ohio Feb. 1, 2021); *Mescall v. U.S. Dep't of Justice*, No. 20-13364, 2021 WL 199277, at *2 (E.D. Mich. Jan. 19, 2021); *Johnson v. JPMorgan Chase Bank, N.A.*, 488 F. Supp. 3d 144, 155 (S.D.N.Y. 2020).

[59] R. Doc. 45, p. 8 (emphasis in original, quotation marks omitted).

[60] *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (citations and internal quotation marks omitted).

[61] *Id.*

in CARES Act benefits.[62]   In *Jackson v. Daniel*, the court dismissed as frivolous a due process

claim for termination of PEUC benefits, stating:

> Plaintiff identifies no state statute, rule, or provision that creates a property right in
> supplemental unemployment benefits under the CARES Act. Instead, "the CARES
> Act created *temporary* federal benefits to *supplement* state benefit programs."
> [*Moss*, 2022 WL 68388, at *6.] Courts have found that the CARES Act did not
> create state property rights in those supplemental benefits because "federal law
> specifically allows states to exercise discretion in ending their distribution of the
> federal supplemental benefits." *Id.; see also* [*Dickerson*, 2021 WL 4192740, at *3]
> (holding that supplemental unemployment benefits under the CARES Act are not
> protected property rights).[63]

Without a property interest in CARES Act benefits, those Plaintiffs claiming that they

should have been paid those benefits cannot state a procedural due process claim related to the

denial of benefits.  To the extent there is a property interest in CARES Act benefits once awarded,

Plaintiffs still fail to state a claim as to those benefits because pre-deprivation notice is not required,

and post-deprivation remedies are adequate.

### 2. The Procedural Due Process Claim Fails as to Plaintiffs' Claims Regardless of the Type of Benefits[64]

In assessing whether a due process violation has occurred, a threshold question for the

Court is whether the party asserting the violation has a protected property interest that he claims

has been violated.[65]  Some courts have recognized that unemployment benefits claimants have a

---

[62] *See, e.g.*, *Moss v. Lee*, No. 21-561, 2022 WL 68388, at *5 (M.D. Tenn. Jan. 6, 2022) ("Plaintiffs have no property right to CARES Act benefits."); *Dickerson v. Texas*, No. 21-2729, 2021 WL 4192740, at *3 (S.D. Tex. Sept. 15, 2021) (noting that individuals could not have a property interest in CARES Act benefits because they could be discretionarily removed and were not entitlements); *Jackson v. Daniel*, No. 21-1107, 2022 WL 1157656, at *4 (W.D. Tex. April 18, 2022) ("Courts have found that the CARES Act did not create state property rights in those supplemental benefits because federal law specifically allows states to exercise discretion in ending their distribution of the federal supplemental benefits.") (internal quotation marks and citations omitted).

[63] *Jackson v. Daniel*, No. 21- 1107, 2022 WL 1157656, at *4 (W.D. Tex. Apr. 18, 2022) (emphasis in original).

[64] To the extent Plaintiffs allege that LWC's failure to advise them of appeal rights violates due process, such a claim is subject to dismissal.  *See LeBeouf v. Manning*, No. 12-2583, 2015 WL 3650797, at *11 (E.D. La. June 11, 2015) (no due process violation when a party is not afforded notice of appeal rights) (collecting cases).

[65] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).

property interest in state unemployment benefits entitled to the protections of the Due Process Clause, though this is an open question under Louisiana law.[66]  When a property interest exists, the question becomes whether the procedures in place are sufficient to protect that property interest.  The protections necessary to satisfy due process vary depending on the "time, place and circumstances . . . as the particular situation demands."[67]

Plaintiffs assert that pre-deprivation notice and an opportunity to respond were required prior to ceasing payment of unemployment benefits.[68]  They also appear to allege that post-deprivation remedies were inadequate in violation of their due process rights.  Plaintiffs' first argument fails because no pre-deprivation process was due.

### a. Pre-Termination Process Was Not Required

Assuming both a property interest in benefits and that a deprivation has occurred, the next question becomes what process is due before the deprivation of the interest is constitutionally permissible.  The Supreme Court has punted on the issue of whether a pre-termination hearing is required before discontinuing unemployment benefits.[69]  In general, due process requires "the opportunity to be heard at a meaningful time and in a meaningful manner" when an individual is deprived of liberty or property interests.[70]  Whether a pre-deprivation hearing is required depends upon a balancing of the competing public and private interests involved, as defined by the familiar

---

[66] *See Rivers v. Cavazos*, No. 94-50563, 1995 WL 581851, at *5 (5th Cir. Sept. 8, 1995) (unpublished) (recognizing that Texas unemployment benefits claimants had a property interest in unemployment benefits); *Berg v. Shearer*, 755 F.2d 1343, 1345 (8th Cir. 1985) (citing cases).  The pertinent inquiry is whether the state law is drafted such that a property interest arises. The Court does not need to answer the question of whether Louisiana law recognizes an entitlement to state unemployment benefits. It is noted, however, that to state a procedural due process claim, an individual must have a legitimate claim of entitlement to the property, *Gonzales*, 545 U.S. at 756; this is especially problematic for Plaisance because she was never determined to be eligible for benefits.
[67] *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal citations and quotation marks omitted).
[68] R. Doc. 45, p. 30.
[69] *See, e.g.*, *Torres v. N.Y. State Dep't of Labor*, 410 U.S. 971 (1973); *Fusari v. Steinberg*, 419 U.S. 379 (1975).
[70] *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (internal quotation marks omitted)).

*Mathews* factors: (1) the private interest affected by the government action; (2) the risk of erroneous deprivation and the value of additional safeguards; and (3) the government's interest, including the fiscal and financial burdens that additional or substitute procedural requirements would entail.[71]  Considering these factors and based upon a review of the pertinent case law, the Louisiana statutes, and the allegations of the Amended Complaint, a pre-deprivation hearing was not required to satisfy due process with regard to Plaintiffs' claims.  The facts of this case are not significantly distinguishable from *Mathews*, *Robbins*, and other cases where courts have found that hearings are not required prior to the termination of benefits.[72]

As to the first factor, the sole private interest at issue is uninterrupted receipt of benefits. This was the same interest at stake in *Goldberg*,[73] *Mathews*,[74] and *Robbins*.[75]  In *Goldberg*, it was determined that due process required an evidentiary hearing prior to deprivation. That case emphasized, however, that a pre-deprivation hearing was necessary because welfare assistance is given to persons on the very margin of subsistence: "Thus the crucial factor in this context—a factor not present in the case of . . . virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits."[76]  As recognized by the Supreme Court, the crucial factor in finding that a pre-deprivation hearing was necessary was a factor that does not exist in the case of "*virtually anyone else whose governmental entitlements are ended.*"[77]

---

[71] *Id.* at 335.
[72] *See, e.g.*, *Graves v. Meystrik*, 425 F. Supp. 40, 48-50 (E.D. Mo. 1977), *aff'd*, 431 U.S. 910 (1977); *Gary v. Nichols*, 447 F. Supp. 320 (D. Id. 1978); *Berg*, 755 F.2d at 1346-47.
[73] *Goldberg v. Kelly*, 397 U.S. 254, 255-56 (1970).
[74] *Mathews*, 424 U.S. at 333.
[75] *Robbins v. U.S.R.R. Ret. Bd.*, 594 F.2d 448, 449 (5th Cir. 1979).
[76] *Goldberg*, 397 U.S. at 264.
[77] *Id.* (emphasis added).

*Mathews* and *Robbins* are more akin to the scenario in this case. As stated above, the same private interest was at stake in *Mathews* and *Robbins*, and in both cases, the Supreme Court and the Fifth Circuit, respectively, determined that a pre-deprivation hearing was not required to comport with due process.

In *Mathews*, the Supreme Court tackled the question of whether beneficiaries of social security disability benefits were entitled to a hearing prior to termination of those benefits, and the Court answered in the negative. The Court noted the important distinction between *Goldberg* and *Mathews*, specifically that the welfare benefits at issue in *Goldberg* were based upon financial need, while the disability benefits at issue in *Mathews* were not based upon financial need and were "wholly unrelated to . . . support from many other sources, such as earnings of other family members . . . tort claims awards, savings, private insurance . . . food stamps. . . ."[78] "[T]he degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process."[79] The Court found that the deprivation in *Mathews* was likely to be less than in *Goldberg*, even though to remain eligible for benefits the recipient must be "unable to engage in substantial gainful activity," which the Court recognized provided little possibility that the beneficiary would be "able to find even temporary employment to ameliorate the interim loss."[80] The Court also recognized that the possible length of time of the deprivation is an important factor to be considered, but still found that "the disabled worker's need is likely to be less than that of a welfare recipient" even though the length of time between the cutoff of benefits and a final decision after a hearing exceeded one year.[81] The Court

---

[78] *Mathews*, 424 U.S. at 340-41.
[79] *Id.* at 341.
[80] *Id.*
[81] *Id.* at 342.

recognized that on top of access to private resources, other forms of government assistance would become available if the terminated beneficiary or his family fell below the subsistence level.

Similarly, in *Robbins*, the Fifth Circuit examined Supreme Court precedent and determined that pre-deprivation hearings were not required to satisfy due process concerns for terminating unemployment benefits for railroad beneficiaries.[82]  That court noted it was inclined to follow *Mathews* because, like Social Security disability benefits, the unemployment benefits were not based upon "dire need."[83]  The court also noted that the summary affirmance by the Supreme Court of another case in which the lower court found that pre-deprivation hearings were not required prior to termination of regular unemployment benefits dictated the same result.[84]

The need of state unemployment beneficiaries is analogous to the need of social security beneficiaries and beneficiaries receiving special unemployment benefits for railroad employees. State unemployment benefits are not need based. These benefits do not consider savings, assistance from other family members, and other potential sources of income, like the benefits at issue in *Mathews* and *Robbins*.[85]  Unemployment beneficiaries are simply not in the same state of "dire need" as the welfare beneficiaries in *Goldberg*.  Further, as pointed out in *Mathews*, if the would-be unemployment beneficiaries entered a state of "dire need," they could rely upon other programs, such as welfare.  Thus, the first factor, private interest, weighs against requiring a pre-deprivation hearing.

Regarding the second factor, risk of erroneous deprivation and value of additional safeguards, here, the risk of erroneous deprivation is, again, more like that in *Mathews* than the

---

[82] *Robbins*, 594 F.2d at 449.
[83] *Id.*
[84] *Id.*
[85] The CARES Act provided supplements to state unemployment benefits and also did not consider savings or other indicators of financial well-being in making a determination regarding eligibility. *See* 15 U.S.C. § 9021, *et seq.*

welfare recipients in *Goldberg*.  The *Goldberg* welfare recipients could have benefits terminated based on a wide variety of information that may be deemed relevant, and witness credibility and veracity are often critical to the decisionmaking process.[86]  In contrast, in *Mathews*, discontinuance of disability benefits was based upon routine questionnaires and medical reports by physicians. The Court noted that the questionnaire periodically sent to disability benefits recipients identifies the pertinent information for the decision regarding benefits.  Similarly, the information required for determining initial eligibility and weekly eligibility required by LWC is limited, and there is little to no credibility determination.  To qualify for benefits during the pandemic, an individual only had to demonstrate that s/he was an "employee," who lost income or their job through no fault of their own (*i.e.*, they were not fired and did not quit), and earned no more than $247 per week.[87] To maintain weekly eligibility, the benefits recipient must remain unemployed or underemployed, be able to work, available for work, and have earned sufficient wages during the base period under a formula provided by statute.[88]  These criteria are objective compared to the subjective criteria noted for welfare recipients in *Goldberg*, and the risk of erroneous deprivation appears minimal.

Further, a neutral employee of the state reviews the applications, and as stated in *Mathews*, "[i]n assessing what process is due in this case, substantial weight must be given to the good-faith judgments of the individuals charged . . . with the administration of social welfare programs that the procedures they have provided assure fair consideration of the entitlement claims of

---

[86] *Goldberg*, 397 U.S. at 269.
[87] *See* R. Doc. 67-2, p. 7; *see also* La. R.S. 23:1600, *et seq.*
[88] La. R.S. 23:1600. Generally, an individual must also conduct an appropriate work search, as defined by statute, to be eligible for benefits, but the work search requirements were waived during the pandemic. *See* Office of Governor John Bel Edwards, COVID-19 State of Emergency Provisions for Unemployment and Necessary State Employees, Proclamation Number 43 JBE 2020 (April 7, 2020), Proclamations | Office of Governor John Bel Edwards (louisiana.gov).

individuals."[89]  Considering the objective criteria by which unemployment benefits are judged, the second factor weighs against the need for a pre-deprivation hearing, just as in *Mathews*.

In assessing the final factor, the public interest, the *Mathews* Court noted that the cost of requiring payment of benefits until after hearings would result in "additional cost in terms of money and administrative burden [that] would not be insubstantial."[90]  Though financial cost is not dispositive of what procedural safeguards are necessary prior to administrative decisions, the government's interest, and thus, the public interest, "in conserving scarce fiscal and administrative resources is a factor that must be weighed."[91]  The fiscal concerns during the time period of Plaintiffs' allegations, which encompass the entirety of the COVID-19 pandemic, is further heightened by the substantial resources dedicated to unemployment during the pandemic.  As noted by Cates, $6,872,770,974 was provided in total unemployment benefits between March 28, 2020 and December 31, 2020; $1,414,641,392 of that came from the State unemployment insurance program.[92] Further, from January 1, 2020 through September 30, 2020, it is estimated that $405,395,022 in benefits were improperly paid.[93]

Had pre-deprivation hearings been required before terminating benefits for all beneficiaries, the financial strain on the state and the amount of improper payments would have likely been even greater. The State has a significant interest in avoiding overpayments, the related administrative burdens associated with trying to recoup overpayments, and in avoiding the administrative burdens associated with a pre-deprivation hearing.[94]  Further, while the ability of

---

[89] *Mathews*, 424 U.S. at 349.

[90] *Id.* at 347.

[91] *Id.* at 348.

[92] R. Doc. 67-2, p. 6.

[93] *Id.*, p. 8,

[94] *Mathews v. Ohio Pub. Employees Ret. Sys.*, 91 F. Supp. 3d 989, 1000 (S.D. Ohio 2015) ("the government has a significant interest in avoiding overpayments to disability benefits recipients and in avoiding the administrative burdens of trying to recoup any overpayment of benefits. The government also has an interest in avoiding the administrative burdens associated with holding a pre-deprivation hearing.") (internal citations omitted).

the State to recoup overpayments is doubtful, if an individual should have been paid benefits and was not, retroactive payment of benefits to the individual is guaranteed.[95]   Additionally, pre-deprivation hearings, especially during the pandemic, would simply not have been administratively feasible considering the great influx of claims.[96]   Thus, the final factor also weighs against requiring a pre-deprivation hearing. Considering the relevant factors, a pre-deprivation hearing was not necessary prior to denying or terminating unemployment benefits.[97]

### b. Plaintiffs Failed to Fully Utilize Post-Deprivation Remedies

Having found that a pre-deprivation hearing was not necessary, the next question is whether post-deprivation procedures adequately protect due process concerns.  The process for applying, determining eligibility, and appealing unemployment benefits claims is contained in La. R.S. 23:1600, *et seq.*[98]   Once a claim is filed, a determination of eligibility is made and within thirty days of the date the claim was filed, notice is delivered to the claimant and his previous employer.[99] If it is determined that a claimant is disqualified, notice with the reasons for disqualification shall be delivered to the claimant.[100]   If a claimant is dissatisfied with the disposition of his unemployment claims, he may appeal the decision.[101]   If a claimant is still

---

[95] La. R.S. 23:1635.
[96] R. Doc. 67-2, p. 5.
[97] Plaintiffs attempt to buttress their argument that a pre-deprivation hearing was required with the fact that the Department of Labor Criteria for substantial compliance provides that 93% of first payments should be issued within 35 days following the end of the first compensable week of unemployment for the benefit year. 20 C.F.R. 640.5. These guidelines have no impact on the procedural due process analysis and were promulgated pursuant to 42 U.S.C. § 503(a)(1), which does not provide a private right of action, as discussed below.
[98] Federal benefits under the CARES Act were subject to the same appeals process.  *See, e.g.*, 15 U.S.C. § 9021(c)(5)(B) ("All levels of appeal filed under this paragraph in the 50 states…—(i) shall be carried out by the applicable State that made the determination or redetermination; and (ii) shall be conducted in the same manner and to the same extent as the applicable State would conduct appeals of determinations or redeterminations regarding rights to regular compensation under State law.").
[99] La. R.S. 23:1624.
[100] La. R.S. 23:1625.
[101] La. R.S. 23:1629.

18

aggrieved after the appeal, he may proceed to the board of review.[102]  Finally, if still dissatisfied

with the outcome of those proceedings, the claimant may proceed with judicial review.[103]

The Court need not reach the ultimate question regarding whether the above procedures

comport with due process because this claim is subject to dismissal since all Plaintiffs failed to

fully utilize the state's post-deprivation procedures prior to bringing this suit.[104]  Under Fifth

Circuit precedent, a party complaining of a lack of due process is required to utilize available state

court remedies before proceeding to court under § 1983.[105]  As the Fifth Circuit reasoned, "[the

plaintiff] cannot skip an available state remedy and then argue that the deprivation by the state was

the inadequacy or lack of the skipped remedy."[106]  While Plaintiffs contend that state remedies

were not "available" due to delay and other administrative issues, this argument is unpersuasive.

---

[102] La. R.S. 23:1630.

[103] La. R.S. 23:1634.

[104] *See LeBeouf*, 2015 WL 3650797, at *10-11 (discussing the difference between pre-deprivation and post-deprivation due process claims and finding that the failure to utilize post-deprivation procedures prior to filing suit in federal court is fatal to a claim regarding inadequacy of post-deprivation procedures).  Coleman lodged an appeal that had not been heard as of the filing of the Amended Complaint (R. Doc. 45, p. 24), so she has not proceeded through the process as required.  Although Strick's overpayment determination is final, he did not appeal, but contacted LWC, resolved his issues, and awaits receipt of reinstated benefits. R. Doc. 45, p. 25. Plaisance states that she cannot appeal the benefits weeks that indicate her claim is "processing" (R. Doc. 45, p. 20), but does not explain why she did not appeal the benefits weeks indicating her status is "disqualified."

[105] *See, e.g, Burns v. Harris Cnty. Bail Bond Bd.*, 139 F.3d 513, 519 (5th Cir.1998) (holding that the plaintiff cannot complain that "her due process rights were violated when she skipped an available state remedy"); *Browning v. City of Odessa*, 990 F.2d 842, 845 n. 7 (5th Cir.1993) (recognizing that the court "has consistently held that one who fails to take advantage of procedural safeguards available to him cannot later claim that he was denied due process"); *Rathjen v. Litchfield*, 878 F.2d 836, 839–40 (5th Cir. 1989) ("no denial of procedural due process occurs when a person has failed to utilize the state procedures available to him"); *Galloway v. Louisiana*, 817 F.2d 1154, 1158 (5th Cir. 1987) ("[a]n employee cannot ignore the process duly extended to him and later complain that he was not accorded due process" and thus finding no procedural due process violation); *see also Numrich v. Warner*, No. 12-1593, 2012 WL 6738544, at * 6 (D. Or. Dec. 31, 2012) (dismissing unemployment benefit claimant's procedural due process claim where he failed to request a hearing after he was denied benefits); *Akuma v. New Jersey Comm'r of Dep't of Labor and Workforce Dev.*, No. 07-1058, 2008 WL 4308229, at *2 (D. N.J. Sept.17, 2008) (granting summary judgment on plaintiff's claim where he failed to take advantage of state's processes available to claimant's dissatisfied with state's determinations regarding eligibility for unemployment benefits).

[106] *Myrick v. City of Dallas*, 810 F.2d 1382, 1388 (5th Cir. 1987).

Delay itself does not render post-deprivation procedures unavailable,[107] so any argument related to delay rendering the unavailability of these procedures is without merit.

The Amended Complaint also alleges that terminations or denials for unemployment benefits do not provide sufficient details for the claimant to prepare a defense, also presumably rendering the state post-deprivation process "unavailable."[108] Considering the relatively few objective factors considered for unemployment eligibility, this argument is also unpersuasive. As noted above, eligibility for unemployment is based on a finite list of qualifications, so even if LWC cursorily denies eligibility or terminates benefits, the denied claimant may appeal and explain why s/he meets each qualification. This burden on the claimant is not so onerous as to render the post-deprivation procedure unavailable.

Finally, to the extent Plaintiffs allege they were unable to file appeals because the LWC website was inaccessible and the like, this does not demonstrate an inability to file an appeal.[109] As noted above, appeals may be submitted in various ways, including by regular mail.[110] The claims in the Complaint provide no explanation as to why Plaintiffs could not appeal via regular mail. Overall, the facts provided by Plaintiffs do not demonstrate that the post-deprivation procedures provided in La. R.S. 23:1600, *et seq.*, were so unavailable as to fail to comply with due process. To the contrary, procedures were available, though they may have required extra

---

[107] *See Mathews*, 424 U.S. at 342 (delay exceeding one year did not warrant pre-deprivation process); *Cronin v. Town of Amesbury*, 81 F.3d 257, 260 (1st Cir. 1996) (delay by itself does not establish that the remedy is unavailable; noting that despite the almost three-year delay, the possibility of reinstatement remained available to plaintiff). *See also, Home Health Licensing Specialists Inc v. Leavitt*, No. 07-2150, 2008 WL 4830543, at *5 (N.D. Tex. Nov. 7, 2008) (delay of over two years did not render administrative remedies unavailable).
[108] R. Doc. 45, p. 16.
[109] *Id.*, pp. 22-23.
[110] Indeed, in the same timeframe that Bass alleges he was unable to appeal because channels were not available, Plaintiff Coleman lodged an appeal. *Id.*, pp. 22-24.

patience.[111] Thus, Plaintiffs' failure to utilize state procedures prior to proceeding to this Court is fatal to their claim that post-deprivation procedures did not comport with due process.

### 3.  Plaintiffs have not Stated a Claim under 42 U.S.C. § 503(a)(1)

Plaintiffs also assert a claim that delay in payments of unemployment by LWC violated the "when due" clause of § 503(a)(1).  Though a private right of action was found to exist in the slim circumstances present in *Java*,[112] since the Supreme Court's decision in *Gonzaga Univ. v. Doe*,[113] courts have questioned whether § 503(a)(1) provides a private right of action under any circumstance except that considered in *Java*.  Finally, this year, one court answered that question in the negative, and the persuasive analysis in *Sherwood* results in an adoption of its conclusion here: except for the limited circumstances present in *Java*, § 503(a)(1) does not provide a private right of action.[114] Because Plaintiffs' claims do not arise under the same circumstances as *Java*, Plaintiffs do not have a private right of action under § 503(a)(1).

In this case, as all claims over which the Court had original jurisdiction are dismissed, and as Plaintiffs have acknowledge that state law claims cannot be maintained,[115]

**IT IS ORDERED** that the *Motion for Judgment on the Pleadings to Dismiss Ava Cates in Her Official Capacity as Secretary of the Louisiana Workforce Commission* is **GRANTED**.  All

---

[111] Due to the lack of case law on what it means for a procedure to be "unavailable" in the context of post-deprivation procedures, the Court may also borrow from what is required for an administrative remedy to be "unavailable" in the context of prison grievance procedures to aid its determination that the post-deprivation process here was available. Procedures may be deemed unavailable if they operate as a simple dead end, if the procedures are so opaque that it is essentially unknowable and impossible to navigate, and when officials thwart the procedures through machination, misrepresentation, or intimidation.  *Ross v. Blake*, 578 U.S. 632, 640-646 (2016).  The Amended Complaint does not allege any of these circumstances, also leading the Court to conclude that post-deprivation procedures were available.
[112] *California Dep't of Hum. Res. Dev. v. Java*, 402 U.S. 121 (1971).
[113] 536 U.S. 273 (2002).
[114] *Sherwood v. Richards*, No. 20-7285, 2022 WL 408273, at *2-4 (N.D. Ill. Feb. 10, 2022).  The only instance in which a private right of action exists is when a plaintiff contends a state statute, as written, is actually inconsistent with § 503.  *Id.*; *Java*, 402 U.S. at 133-135.  Here, the complaint is not related to the language of the statute.
[115] R. Doc. 72, p. 25.

federal claims against Defendant Ava Cates in her official capacity for prospective injunctive relief are **DISMISSED WITH PREJUDICE** and the Clerk of Court is instructed to **CLOSE** this case.

Signed in Baton Rouge, Louisiana, on <u>September 30, 2022</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**